UNITED STATES of America, Plaintiff,

v.

Joseph W. RYLES, a/k/a Joseph Peterson; James Reid; Alvin Dumont Ewell; and Gilbert Wiley, Defendants.

Crim. A. No. 1897.

United States District Court
D. Delaware.

Oct. 11, 1968.

L. Vincent Ramunno, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

F. Alton Tybout and Morton R. Kimmel, Wilmington, Del., for defendant Ryles, a/k/a Joseph Peterson.

Walter K. Stapleton and Walter Leon Pepperman, II, Wilmington, Del., for defendant Alvin Dumont Ewell.

## OPINION

LAYTON, District Judge.

On June 6, 1968, the Grand Jury for this District returned an eight count indictment against Joseph W. Ryles, Alvin Dumont Ewell and two others, charging them with violations of the Federal Narcotics Laws.[1] After entering pleas of "not guilty", the defendants Ryles and Ewell moved, pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, to suppress certain evidence seized by Federal Narcotics Agents, and defendant Ewell moved, pursuant to Rules 8 and 14, F.R.Cr.P., to sever his trial from that of the other three defendants. An evidentiary hearing was held, briefs were filed and oral argument was heard. Based upon the foregoing, the motion to suppress will be denied and the motion to sever will be granted.

From the evidence heard, the Court finds the following facts:

1. In late February, 1968, Morris Davis, Jr., an agent for the Bureau of Narcotics and Dangerous Drugs, the Department of Justice, commenced an investigation of illicit drug traffic in Wilmington, Delaware. In the course of his investigation, Davis, posing as a drug pusher, was introduced to defendants Ewell and Ryles, from whom he purchased narcotics on several occasions prior to March 29, 1968.

2. On Friday, March 29, 1968, Agent Davis, while still posing as a drug pusher, ordered a quantity of heroin and cocaine from defendant Ewell, the drugs to be supplied by defendant Ryles.

3. At about 6:00 p. m. on Sunday, March 31, 1968, after several telephone calls spaced throughout the day, Agent Davis was advised by Ewell that Ryles had arrived in Wilmington and that he, Davis, could see Ryles at 618 W. 9th Street, in Wilmington.

4. Agent Davis arrived at 618 W. 9th at 6:15 p. m., or thereabouts, and was admitted to the apartment building by Ewell, who then accompanied Agent Davis to a second floor apartment, which was leased by a Curtis Taylor, but in which Ewell was a semi-permanent guest and in which Ryles was visiting Ewell.

5. Upon entering the apartment, Davis was in the living room; he proceeded from there through a dining room into the kitchen, where he saw the defendant Ryles arising from the kitchen table, apparently just having completed a meal.

6. In the kitchen with Ryles was William Simpson, with whom Ryles was discussing the quality of the drugs that he had been selling Simpson.

7. On the kitchen table, in plain view, were two plates, an aluminum foil package, two brown paper bags, a partially full Scotch bottle and some drinking glasses.

8. Simpson and Ryles completed their discussion and Simpson left the apartment to get his "works".[2]

9. After Simpson's departure, Ryles removed a plastic bag of white powder and a block of mannite[3] from the paper bags on the table and proceeded to sift the white powder and the mannite through a silk screen by running a playing card across the screen. Agent Davis recognized this operation as the cutting of heroin.

10. Davis then discussed with Ryles the purchase of the drugs that Ryles then had. Ryles stated that the price for the heroin and cocaine was $2800.00. Davis stated that he would purchase the drugs; but, that he would have to borrow $300.00 as he only had $2500.00 with him.[4]

---

1. The indictment charges Ryles and Ewell with violations of 26 U.S.C. §§ 4705(a), 7237(b), 18 U.S.C. § 371 and 21 U.S.C. § 174.

2. "Works" is a term used on the street to mean the paraphernalia used to administer drugs.

3. Mannite or mannitol is a sugar commonly used by those engaged in illicit drug traffic to "cut" or dilute heroin.

4. In point of fact, however, Agent Davis testified that he only had $50.00 with him.

11. Davis left the apartment and went directly to his car where Officer Ricks was waiting. After telling Officer Ricks that he had satisfied himself that drugs in quantity were in the apartment, Davis gave a pre-arranged signal to other police officers in the area and then started back to the apartment with Officer Ricks.

12. At Ewell's suggestion, Davis had left ajar the vestibule door on the ground floor and so he and Officer Ricks entered the building unannounced.

13. Ewell admitted Davis to the apartment, where Davis immediately identified himself and advised Ewell that he was placing him under arrest.

14. Davis next went into the kitchen where he identified himself to Ryles and Simpson, who had returned during Davis' absence, and immediately placed them under arrest.

15. Within minutes, the other police officers arrived and removed the defendants from the apartment.

16. Agent Young, who had entered the apartment with the police officers, seized the paper bags and the aluminum foil package which were still on the kitchen table.

17. A subsequent chemical analysis of the contents of the bags and package disclosed a sizable quantity of heroin and cocaine.

18. Until Agent Davis identified himself at the time of his re-entry, his true identity was unknown to the defendants.

19. Davis' entrance into the apartment on both occasions was effected with neither a search warrant nor an arrest warrant.

20. Davis came to the meeting in the apartment in the hope that Ryles would voluntarily produce illegally possessed drugs during the course of negotiations for the purchase of such drugs.

21. The place for the negotiations was selected by the defendants.

## THE MOTIONS TO SUPPRESS

In support of their identical motions to suppress, the defendants contend that Agent Davis conducted an unreasonable search of the second floor apartment at 618 W. 9th Street during his first visit there on Sunday, March 31, 1968, and that the subsequent arrests and seizure are tainted by the search, making the drugs seized inadmissible in evidence and subject to suppression.[5] According to the defendants, the search is invalid because it was made without a warrant, was not incident to a lawful arrest and the defendants did not voluntarily waive their Fourth Amendment rights.[6] The government's position is that there was no search, and alternatively, if there were a search, that it was not an unreasonable one because of the exigent situation with which Agent Davis was confronted.

Concededly, as defendants contend, a search is unreasonable unless made pursuant to a valid search warrant or justified by certain recognized exceptions. Nevertheless, in considering the events of March 31st, I am of the view that neither Davis' first nor second visit violated defendants' constitutional rights.

Initially, the Court is confronted by the government's contention that there was no need for a search warrant because there was, in fact, no search. While there is some authority in support of the government's position, I am of the view that the Third Circuit in Fraternal Order of Eagles, No. 778, Johnstown, Pa. v. United States, 57 F.2d 93, 94 (3d Cir., 1932) established that in this Circuit a search is made when federal agents enter a protected area to inspect it visually whether or not they ransack or engage in other conduct usually suggested by the word "search".

Having determined that Agent Davis' conduct during the first visit to the apartment was a search, the issue now presented is whether the search was an unreasonable one within the meaning

---

5. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), Rule 41(e), F.R.Cr.P.

6. The standing of the defendants to assert a Fourth Amendment claim is not contested by the government.

of the Fourth Amendment. To be sure, the apartment at 618 W. 9th Street is entitled to the "full range of Fourth Amendment protections." Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). However, as the United States Supreme Court held in *Lewis,* an individual waives his Fourth Amendment rights when he converts his home into a "commercial center to which outsiders are invited for purposes of transacting unlawful business." Here, Agent Davis was invited to come to the defendants' apartment for the express purpose of engaging in unlawful business, to wit, the purchase of narcotics. Agent Davis accepted the invitation and his actions throughout the initial visit were in nowise inconsistent with the scope of the invitation which brought him to the apartment. At oral argument, the defendants suggested that this case is distinguishable from *Lewis* because here, Agent Davis came to the apartment solely to ascertain whether there were contraband drugs on the premises, whereas in *Lewis,* the Agent came to the petitioner's home to purchase drugs. In both cases, it is clear that the Agent's purpose in accepting the occupant's invitation was to amass evidence for use in a subsequent criminal proceeding.[7] The administration of criminal justice cannot rest on such finely drawn distinctions as suggested by defendants here.

Counsel for the defendants also urged that were this Court to uphold Agent Davis' conduct, the protection afforded by the Fourth Amendment would be seriously eroded; that in effect, whenever federal agents are able to deceive an occupant of protected premises as to their identity or purpose, the occupant would be divested of his Fourth Amendment rights. To the contrary, the waiver found by the Court in *Lewis,* and the

waiver found here, applies only where the occupant of the protected premises extends an invitation to outsiders to enter those premises to engage in illegal activity. However, any conduct by the federal officer which transcends the bounds of the invitation, e. g., surreptitiously ransacking the occupant's bureau drawers while he is out of the room, would hardly be within the scope of the waiver.

Alternatively, the defendants attempt to distinguish the *Lewis* case on the ground that here there are no facts which show that the defendant converted the apartment at 618 W. 9th into a place open to the public to transact illegal business. In this case, there can be little doubt from a reading of the hearing transcript, and I so find, that these defendants would have welcomed virtually anyone whom they believed to be genuinely interested in purchasing narcotics. Surely, the facts of *Lewis* require no more, if indeed they require this much.

I turn now to the second visit at which the seizure of the drugs occurred. The Fourth Amendment, by its terms, applies to unreasonable seizures as well as to unreasonable searches; thus, Agent Davis' actions during the second visit must be within the confines of permissible conduct under the Fourth Amendment. However, on this point, defendants concede, and properly so, that if Davis' initial visit were upheld as valid, the subsequent visit, the arrest and the seizure of the drugs are unassailable.

Accordingly, the motions to suppress will be denied.

### THE MOTION TO SEVER

Defendant Ewell seeks to sever the trial of his case from that of the other three defendants arguing that joinder in this instance is not permis-

7. That this was the Agent's purpose in *Lewis* is made clear by the following language in the dissent by Mr. Justice Douglas:

"Entering another's home in disguise to obtain evidence is a 'search' that should bring into play all the protective fea-

tures of the Fourth Amendment. When the agent in *Lewis* had reason for believing that petitioner possessed narcotics, a search warrant should have been obtained." 385 U.S. at 345, 87 S.Ct. at 441.

sible under Rule 8(b), F.R.Cr.P., and that even if permissible, the Court should exercise its discretion under Rule 14, F.R.Cr.P., to avoid possible severe prejudice to this defendant. The government contends that the joinder was entirely proper and that "a severance would require separate trials at a detriment to the public and to the judicial system without any real benefit to the defendant."

Because this is a small district with a comparatively light trial calendar, I am of the view that the possible prejudice to this defendant need not be risked. Therefore, defendant Ewell's motion to sever will be granted.

Submit order.