# FRATERNAL ORDER OF EAGLES, NO. 778, JOHNSTOWN, PA., et al. v. UNITED STATES.

## No. 4662.

Circuit Court of Appeals, Third Circuit.

March 1, 1932.

BUFFINGTON, Circuit Judge, dissenting.

D. P. MacQuarrie and J. Howard Devlin, both of Pittsburgh, Pa., for appellants.

Louis E. Graham, U. S. Atty., and James H. Dilley, Asst. U. S. Atty., both of Pittsburgh, Pa.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

This is an appeal from a decree of the District Court enjoining the appellants from manufacturing, selling, or storing intoxicating liquor on their lodge property for one year and closing it for the same period. The decree provided, however, that, at the end of three months from the date thereof, the premises might be opened and used in a lawful manner on condition that a bond be filed in the sum of $1,000.

On November 19, 1930, prohibition agents were admitted to the lodgerooms of the Fraternal Order of Eagles at New Kensington, Pa., on the representation that they were members in good standing of a distant lodge of the same order. This representation was entirely false. They were not members of any lodge of the Eagles. In order to make their false representations appear to be true and thus deceive the members of the lodge, they produced certain cards and receipts on which were written the names and signatures of bona fide members of distant lodges. These cards and receipts had been surreptitiously taken from the lodges without the consent or knowledge of any of the officers or members thereof. After the agents were admitted, they were served with drinks of intoxicating liquor for which they paid. They did not at this time make a physical search of the lodge unless what they could and did discover after they got in may be considered as such. Several days later, however, in their application for a search warrant, they used what they had seen while in the lodge as constituting probable cause. A search warrant was issued, and they formally searched and seized liquor in the lodge. In due time a petition was filed to suppress this evidence. This was dismissed, and the evidence held admissible.

Thereafter, on January 20, 1931, the bill of complaint in this case was filed which sought an injunction under the provisions of section 22, title 2, of the National Prohibition Act (27 USCA § 34), against the premises visited and searched. An answer was filed, and at the hearing the evidence procured by means of the search and seizure was admitted over objection. The court found that the appellants maintained a nuisance at the lodge and accordingly entered the decree enjoining them and closing the lodge.

Several other lodges were entered under the same false representations and they likewise were closed and their officers enjoined. Appeals were taken, and, by stipulation, the decision in the case at bar is to control those cases.

There is no dispute as to the facts. Five questions of law have been raised, but it is necessary to discuss and decide only one of them: Did the evidence secured, as above stated, violate the Fourth Amendment to the Constitution of the United States?

In deciding this exact question, we are not concerned, in general with the illegal acquisition of testimony by tricks, artifice, fraud, or unethical methods; nor are we concerned with entry by prohibition agents, by like means, to such places as saloons, night clubs and speakeasies whose doors are open to all persons who desire to enter and purchase intoxicating liquor. We are concerned only with the search and seizure based on information secured through the deceptive entrance into the lodge. Was it an invasion of

the indefeasible right of personal liberty and private property secured to the appellants by the Fourth Amendment?

A search made as the result of an entry by physical force is not necessary in order to violate the Fourth Amendment. That amendment was designed to protect the individual against the abuse of official authority. A search and seizure following an entry into the house or office of a person suspected of crime by means of fraud, stealth, social acquaintance, or under the guise of a business call are unreasonable and violate the Fourth Amendment. Weeks v. United States, 232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177; Silverthorne Lumber Co., Inc. v. United States, 251 U. S. 385, 40 S. Ct. 182, 64 L. Ed. 319; Gouled v. United States, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647; Amos v. United States, 255 U. S. 313, 41 S. Ct. 266, 65 L. Ed. 654.

The search and seizure in the instant case were based on the information secured through the entry gained by means of false representations. On this information alone they predicated probable cause when later applying for the search warrant, and the fact that a search warrant was thus obtained does not cure the effect of the previous deceptive entry. If the search and seizure had immediately followed this entry, under the principles laid down in the above cases they would unquestionably have violated the Fourth Amendment and set at naught the protection secured by it. The object of the entry was to discover as much as possible and to use what they could see as the basis of an application for a search warrant. When the agents first entered they searched with their eyes, and saw the very thing that they were looking for. This they had no right to see, and when illegally seen they had no right to use it as the probable cause to secure a search warrant. The government may not make an entry by means of false representations, search as fully as possible without arousing suspicion, and later make the fruit of that entry and search the basis of what otherwise might be a legal search and seizure. When it appropriates the benefits, it must bear the burdens, of its own illegal acts. The grafting of the original entry and illegal search upon the later search and seizure did not cure what was unlawful in the first entry and search, but, on the contrary, made the whole unlawful. This search and seizure growing out of the false entry was an invasion of the indefeasible right of the personal liberty and private property of the appellants and a violation of the Fourth Amendment. If the procedure of the agents in this case may be practiced by government officials, then no home in the land is safe, and the Fourth Amendment fails to accomplish its primary object in establishing the "right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures." Such practice would enable zealous government officials to do indirectly and by subterfuge what they may not do directly. It follows that the evidence thus secured should have been suppressed.

In the case of Legman v. United States (C. C. A.) 295 F. 474, 478, we said: "Unlawful and unconstitutional practices get their first footing by silent approaches and slight deviations, under extenuating circumstances, from legal modes of procedure. To obviate these, constitutional provisions for the security of person and property must be liberally construed. The great end for which men entered into society and became parts of the social organism was to make their person and property secure. The right to this security is preserved sacred and incommunicable in all instances, except when taken away or abridged by some public law for the good of the whole. Entick v. Carrington and Three Other King's Messengers, 19 Howell's State Trials, 1029; Boyd v. United States [116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746], supra. This right is so sacred and fundamental that it was determined to implant it in our institutions in the fullness of its integrity by making it a part of the Constitution, free from the possibility of future legislative change. Bram v. United States, 168 U. S. 532, 18 S. Ct. 183, 42 L. Ed. 568; Weeks v. United States [232 U. S. 383, 34 S. Ct. 341, 58 L. Ed. 652, L. R. A. 1915B, 834, Ann. Cas. 1915C, 1177], supra. A man's home is regarded in American and English law as his castle, and not to be invaded under any general authority to search and seize his property. Cooley's Constitutional Limitations, pp. 425, 426; Lieber's Civil Liberty and Self-Government, 62. It is therefore the duty of courts to be watchful for stealthy encroachments against the constitutional rights of citizens (Boyd v. United States, supra), and this watchfulness applies to the administration of the National Prohibition Act, just as to any other law."

What we there said applies with equal force to this case, and the decree is reversed.

BUFFINGTON, Circuit Judge (dissenting).

In this, and in cases of other Eagle Clubs, the court below, on hearing, issued injunctions closing the clubhouses. Such decree was based on the court's findings of fact that these Eagle clubrooms were common nuisances where intoxicating liquors were sold in violation of law. There is no question as to the fact that these Eagle clubrooms were nuisances, and that the lodges, by their club stewards, were selling intoxicating liquors in violation of law. Consequently the only question involved is whether the evidence to support the court's findings and decrees was obtained in a way which violated the rights of the Eagle Clubs under the Constitution of the United States.

Now it is a familiar historical fact that the abuse of illegal searches and seizures by British crown officers, which led to the insertion of this clause in the Constitution of the United States, was that these officers obtained, without hearings had, blank search warrants from magistrates, in which there was no specification of person, premises, or things to be searched or seized. These blanks the crown officer filled up with the names, the premises, and the articles to be seized as his whim or malevolence suggested. In other words, the search warrant put the whole situation in control of the searcher, without the preliminary and protective judgment of a magistrate acting on evidence. It was against such abuses and to protect against the evil of unreasonable searches without probable cause shown to a magistrate that the Constitution (Amendment 4) provided: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." It will therefore be seen that the requirements provided by the Constitution were "probable cause"—this was to be "supported by oath or affirmation"—the warrant was one "particularly describing the place to be searched, and the persons or things to be seized." It follows, therefore, that, if these constitutional requirements in the present case were complied with, the Eagle Clubs had the protection the Constitution provided.

Assuming the Eagle Clubs were entitled to the constitutional safeguarding thus defined, were they denied what the Constitution provided? Clearly not. Before search warrants were issued, not one, but two, persons made affidavits to the effect that they had been in the Eagle Clubs and had bought unlawful intoxicating liquors therein. The truth of these assertions was shown when the premises were searched, illegal liquors found therein, and the selling by the steward was being continued. It is thus clear that the requirements of the Constitution, first, probable cause; second, support of oath; third, description of the place and things to be seized —were complied with.

But the Eagles say, true, but we were denied constitutional protection because of the way the affiants learned of our criminal acts. On the point as to where and how the affiants of probable cause should get their information the Constitution is silent, so that the protection of the Eagle Clubs thus sought is, so to speak, not intraconstitutional but extraconstitutional. This alleged breach of the Constitution of the United States consists in this: These clubs gave their club members cards or certificates of membership, and the affiants, who were prohibition agents, in some way got possession of two such cards, erased the names of the members, inserted other names, and by virtue of such cards were admitted to the club, bought intoxicating liquors, paid therefor, and saw their money placed in the club's cash register by the club steward. This case therefore resolves itself into the question, Was this subterfuge by which the crime was detected a violation of the constitutional rights of these law-breaking clubs? The judge below said "No," and closed the clubs, giving them, by the way, the privilege of using their clubs for lawful purposes, but of which they did not avail themselves, by providing that at the end of three months the clubhouse might be opened and used in a lawful manner, on giving bond. On the other hand, this court says "Yes;" that the constitutional rights of the Eagle Clubs were violated. Because I agree with the view of the judge below and differ from the holding of this court, I now record my respectful, but firm, dissent. I state my reasons therefor.

While the Fourth Amendment recited was for the protection of the citizens, it must not be overlooked that in construing it due regard must be given to the interests of the public. The duty of thus regarding and conserving the public interest, while giving the citizen his rights, was asserted in Carroll v. United States, 267 U. S. 132, 45 S. Ct. 280, 284, 69 L.

Ed. 543, 39 A. L. R. 790, where the Supreme Court said: "The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens." It follows, therefore, in construing the amendment by adding to it a proviso that those who obtain proof of crime cannot avail themselves of subterfuge to obtain such proofs, we are forced to consider what effect such a construction would have on the detection and punishment of crime. I respectfully submit that, if the holding of this court prevail, the power of every anti-crime agency would be lessened, and the ability of crime to thwart detection correspondingly increased.

But we are not forced to such a regrettable holding, for the common law, which antedated the Constitution, had always held that the admissibility of evidence is not affected by the means by which it was obtained. Here at most the subterfuge was, in club practice, unethical, but it was not illegal, for no law forbade subterfuge. But that question is set at rest by the Supreme Court in Olmstead v. United States, 277 U. S. 438, 48 S. Ct. 564, 569, 72 L. Ed. 944, 66 A. L. R. 376, where it held: "The common-law rule is that the admissibility of evidence is not affected by the illegality of the means by which it was obtained." And, referring to obtaining evidence by unethical means, that court further held: "Our general experience shows that much evidence has always been receivable, although not obtained by conformity to the highest ethics. The history of criminal trials shows numerous cases of prosecutions of oathbound conspiracies for murder, robbery, and other crimes, where officers of the law have disguised themselves and joined the organizations, taken the oaths, and given themselves every appearance of active members engaged in the promotion of crime for the purpose of securing evidence. Evidence secured by such means has always been received. A standard which would forbid the reception of evidence, if obtained by other than nice ethical conduct by government officials, would make society suffer and give criminals greater immunity than has been known heretofore. In the absence of controlling legislation by Congress, those who realize the difficulties in bringing offenders to justice may well deem it wise that the exclusion of evidence should be confined to cases where rights under the Constitution would be violated by admitting it."

Such being the law, as stated by the Supreme Court, I justify my following it until that court holds otherwise.