THE STATE OF OHIO ET AL., APPELLEES, *v.* POSEY ET AL., APPELLANTS.

[Cite as State *v.* Posey (1988), 40 Ohio St. 3d 420.]

(No. 87-1677—Submitted September 21, 1988—Decided December 30, 1988.)

Ronald J. O'Brien, city attorney, James J. Fais, city prosecutor, and Maria O. Juskiw, for appellees state of Ohio and city of Columbus.

John A. Connor II Co., L.P.A., and John A. Connor II, for appellants.

WRIGHT, J. Three questions are presented to us for review. The first is whether the FOE, a nonprofit fraternal organization, can ever be found to have engaged in gambling for profit in violation of R.C. 2915.02. The second is whether application of R.C. 2915.02 to the FOE is consistent with the equal protection guarantees of the United States and Ohio Constitutions in light of certain exemptions from prosecution granted to other purely charitable institutions by division (D) of this code provision. The final question is whether the evidence seized by Detective Cook is admissible notwithstanding that the seizure, while made pursuant to a warrant, was preceded by an alleged deceptive warrantless entry into the premises. We answer all three questions in the affirmative, and accordingly we affirm the judgment of the court of appeals.

## I

Appellants have been charged with violations of R.C. 2915.02(A), which states:

"No person shall:

"* * *

"(2) Establish, promote, or operate, or knowingly engage in conduct that facilitates any scheme or game of chance conducted for profit;

"* * *

"(5) With purpose to violate division (A)(1), (2), (3), or (4) of this section, acquire, possess, control, or operate any gambling device."

Appellants' first line of attack on the application of R.C. 2915.02 focuses on the term "for profit." Appellants contend that because the FOE is a "nonprofit" organization, the state cannot prove that the FOE's gambling activities were conducted "for profit." Thus, appellants argue that neither the FOE nor its agents may be prosecuted under R.C. 2915.02.

We agree with appellants that the state must prove that the gambling at issue was "for profit" before they can be convicted of violating R.C. 2915.02. State v. Parker (1948), 150 Ohio St. 22, 26, 37 O.O. 318, 320, 80 N.E. 2d 490, 492; State v. Polozzi (M.C. 1975), 44 Ohio Misc. 34, 38, 73 O.O. 2d 104, 106, 336 N.E. 2d 471, 474. We recognize that the FOE is a "charitable organization" as that term is defined in R.C. 2915.01(H),[1] and is a "fraternal

---

[1] The Fraternal Order of Eagles is a subsection 501(c)(8) organization exempt from federal income taxation under subsection 501(a) of the Internal Revenue Code. R.C. 2915.01(H) provides:

" 'Charitable organization' means any tax exempt religious, educational, veteran's, fraternal, service, nonprofit medical, volunteer rescue service, volunteer firemen's, senior citizen's, youth athletic, or youth athletic park organization. An organization is tax exempt if the organization is, and has received from the internal revenue service a determination letter that is currently in effect, stating that the organization is, exempt from federal income taxation under subsection 501(a) and described in subsection 501(c)(3), 501(c)(4), 501(c)(8), 501(c)(10), or 501(c)(19) of the Internal Revenue Code. To qualify as a charitable organization, an organization, except a volunteer rescue ser-

organization" under the definition of that term in R.C. 2915.01(M).[2] However, we reject the argument that the FOE is *per se* exempt from prosecution under R.C. 2915.02 because it is a "nonprofit" organization.

R.C. 2915.01(E) defines "scheme or game of chance conducted for profit" as "any scheme or game of chance *designed to produce income* for the person who conducts or operates the scheme or game of chance, but does not include a charitable bingo game." (Emphasis added.) Defining "profit" in relation to income is consistent with the common usage of that term. R.C. 1.42.

Black's Law Dictionary (5 Ed. 1979) 1090, defines "profit" as: "Most commonly, the gross proceeds of a business transaction less the costs of the transaction; *i.e.* net proceeds. Excess of revenues over expenses for a transaction; sometimes used synonymously with net income for the period. Gain realized from business or investment over and above expenditures."

Applying this prevailing definition of profit, we see no reason why the income produced by the FOE's use of gambling devices is not "profit." To the extent its revenues exceed its expenses, the FOE certainly profits from its gambling activities. Granted, the

FOE's status as a "nonprofit" institution may affect its use or the taxation of its gambling income. However, this status does not remove "gambling net income" from the definition of "profit."

Accordingly, we hold that a nonprofit organization may be convicted of gambling for profit under R.C. 2915.02. *State* v. *Stow Veterans Assn.* (1987), 35 Ohio App. 3d 45, 46-47, 519 N.E. 2d 660, 661-662.

Appellants next contend that R.C. 2915.02 is unconstitutional in that it exempts from prosecution certain gambling activities of some "charitable organizations" but not others.

It is clear appellant FOE is not exempt from prosecution under R.C. 2915.02 by operation of division (D) thereof. Certain schemes of chance conducted by certain charitable organizations are exempt from prosecution pursuant to R.C. 2915.02(D)(1) and, as noted above, the FOE is a "charitable organization" within the meaning of R.C. 2915.01(H). However, R.C. 2915.02(D)(1) by its clear language limits the class of charitable organizations entitled to the exemption to subsection 501(c)(3) organizations that are operated exclusively for religious, charitable, scientific or like purposes.[3] Organizations such as the

---

vice or volunteer firemen's organization, shall have been in continuous existence as such in this state for a period of two years immediately preceding either the making of an application for a bingo license under section 2915.08 of the Revised Code or the conducting of any scheme of chance or game of chance as provided in division (C) of section 2915.02 of the Revised Code."

[2] R.C. 2915.01(M) provides:

" 'Fraternal organization' means any society, order, or association within this state, except a college or high school frater-

nity, that is not organized for profit, that is a branch, lodge, or chapter of a national or state organization, that exists exclusively for the common business or brotherhood of its members, and that has been in continuous existence in this state for a period of five years."

[3] R.C. 2915.02(D)(1) provides:

"This section does not apply to:

"(1) Schemes of chance conducted by a charitable organization that is, and has received from the Internal Revenue Service a determination letter that is currently in

FOE, described in subsection 501(c)(8) of the Internal Revenue Code and operated exclusively for the benefit of their members, do not fall within this exemption. The exemption provided in R.C. 2915.02(D)(2) is inapplicable for the same reason.[4]

Having found that R.C. 2915.02(D) does not exempt appellant FOE from prosecution, we must consider whether the General Assembly has denied appellant equal protection of the laws in exempting one class of charitable organizations to the exclusion of others. This issue was presented, but not resolved, in this court's recent decision in *State* v. *VFW Post 3562* (1988), 37 Ohio St. 3d 310, 316, 525 N.E. 2d 773, 778-779. For the reasons that follow, we find no constitutional violation in this instance.

The exemptions enumerated in R.C. 2915.02(D) are keyed to classifications created by Congress in subsection 501(c) of the Internal Revenue Code. It is certainly within the province of the General Assembly to incorporate federal statutory provisions into state legislation. *State, ex rel. Gabalac,* v. *Congregation* (1977), 55 Ohio App. 2d 96, 98, 9 O.O. 3d 242,

243, 379 N.E. 2d 242, 244-245. However, appellants contend that the statute is unconstitutional in that it impermissibly distinguishes between subsection 501(c)(3) and 501(c)(8) organizations. Appellants apparently fail to perceive any real distinction between the purposes and organization of the FOE and those of a church. We do.

We begin with the well-established presumption that statutes duly enacted by the General Assembly do not conflict with federal or state constitutional provisions. *Roosevelt Properties Co.* v. *Kinney* (1984), 12 Ohio St. 3d 7, 13, 12 OBR 6, 11, 465 N.E. 2d 421, 427; *State* v. *Renalist, Inc.* (1978), 56 Ohio St. 2d 276, 278, 10 O.O. 3d 408, 409, 383 N.E. 2d 892, 894; R.C. 1.47(A). When there is a challenge to a statute on the grounds that it is being unconstitutionally applied, "the burden is upon the party making the attack to present clear and convincing evidence of a presently existing state of facts which makes the Act unconstitutional and void when applied thereto." *Cleveland Gear Co.* v. *Limbach* (1988), 35 Ohio St. 3d 229, 231, 520 N.E. 2d 188, 191.

In the recent case of *Kadrmas* v.

---

effect, stating that the organization is, exempt from federal income taxation under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code, provided that all of the money or assets received from such scheme of chance after deduction only of prizes paid out during the conduct of the scheme of chance are used by, or given, donated, or otherwise transferred to, any organization that is described in subsection 509(a)(1), 509(a)(2), or 509(a)(3) of the Internal Revenue Code and is either a governmental unit or an organization that is tax exempt under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code, and provided that the scheme of chance is not conducted during, or within ten hours of, a bingo game conducted for amusement pur-

poses only pursuant to section 2915.12 of the Revised Code; * * *."

[4] R.C. 2915.02(D)(2) provides in pertinent part:

"This section does not apply to:
"* * *

"(2) Games of chance, if *all* of the following apply:
"* * *

"(b) The games are conducted by a charitable organization that is, and has received from the Internal Revenue Service a determination letter that is currently in effect, stating that the organization is, exempt from federal income taxation under subsection 501(a) and described in subsection 501(c)(3) of the Internal Revenue Code; * * *." (Emphasis added.)

*Dickinson Pub. Schools* (1988), 487 U.S. ___, ___, 101 L. Ed. 2d 399, 409, 108 S. Ct. 2481, 2487, the United States Supreme Court stated:

"Unless a statute provokes 'strict judicial scrutiny' because it interferes with a 'fundamental right' or discriminates against a 'suspect class,' it will ordinarily survive an equal protection attack so long as the challenged classification is rationally related to a legitimate governmental purpose."

With regard to the application of R.C. 2915.02 to appellant FOE, no suspect classification is made and no fundamental right is curtailed. Accordingly, as with most social and economic legislation, we will uphold the classifications drawn by the statute if they are rationally related to a legitimate state interest. Accord *State* v. *Wyand* (1985), 304 Md. 721, 726-727, 501 A. 2d 43, 46 (quoting *Cleburne* v. *Cleburne Living Center* [1985], 473 U.S. 432, 440); *State* v. *McCleary* (1983), 65 N.C. App. 174, 308 S.E. 2d 883, affirmed (1984), 311 N.C. 397, 316 S.E. 2d 870.

Subsections 501(c)(3) and 501(c)(8) describe two completely different classes of organizations.[5] Subsection 501(c)(3) institutions are "organized and operated exclusively for religious, charitable, scientific," or like purposes, whereas 501(c)(8) institutions are "[f]raternal beneficiary societies * * * operating under the lodge system or for the exclusive benefit of the members." Notably, for an organization to qualify under subsection 501(c)(3), "no part of the net earnings * * * [may] inure[] to the benefit of any private shareholder or individual * * *." On the other hand, a 501(c)(8) organization must provide "life, sick, accident, or other benefits *to the members* * * *." (Emphasis added.) While both 501(c)(3) and 501(c)(8) organizations are exempt from federal income taxation pursuant to subsection 501(a), these organizations do receive dissimilar treatment in other provisions of the federal tax code. For example, we note that contributions to 501(c)(3) corporations are always deductible, while those to 501(c)(8) organizations are deductible only by individuals and only if they are to be used exclusively for charitable purposes. Section 170 of the Internal Revenue Code.[6]

---

[5] Subsection 501(c)(3) organizations are:

"Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

Subsection 501(c)(8) organizations are:

"Fraternal beneficiary societies, orders, or associations —

"(A) operating under the lodge system or for the exclusive benefit of the members of a fraternity itself operating under the lodge system, and

"(B) providing for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents."

[6] Section 170 provides in pertinent part:

"(a) Allowance of deduction. —

"(1) General rule. — There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year.* * *

The definition of "charitable organization" in R.C. 2915.01(H) does include both 501(c)(3) and 501(c)(8) organizations, and for some purposes, R.C. Chapter 2915 does treat 501(c)(3) and 501(c)(8) organizations alike. For example, both 501(c)(3) and 501(c)(8) organizations can apply for a license to conduct bingo games. See R.C. 2915.08(A)(4). However, for purposes of the R.C. 2915.02(D) exemptions, the General Assembly chose to include only 501(c)(3) organizations. We find this choice to be supported by the legitimate state interest not to prohibit certain gambling activities, the proceeds of which are used exclusively for public and charitable purposes and do not inure to the benefit of individual members of the organization. See, *e.g.,* *State* v. *McCleary, supra,* at 188, 308 S.E. 2d at 893. The exemptions set forth in R.C. 2915.02(D) are rationally related to that interest, and thus we find no equal protection violation.

Whether 501(c)(8) organizations should also be exempted from prosecution under R.C. 2915.02 is a question strictly within the province of the General Assembly. It is not for this court to substitute its judgment on such an issue.

Accordingly, we hold that R.C. 2915.02(D) does not deny equal protection of the laws by exempting from the operation of R.C. 2915.02 organizations described in subsection 501(c)(3) of the Internal Revenue Code and not organizations described in subsection 501(c)(8) thereof.

II

Appellants next contend essentially that Detective Cook's visit on May 7, 1986 constituted a warrantless search in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution. It is undisputed that no warrant was issued

---

"'* * *

"(c) Charitable Contribution Defined. — For purposes of this section, the term 'charitable contribution' means a contribution or gift to or for the use of —

"'* * *

"(2) A corporation, trust, or community chest, fund, or foundation —

"(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals;

"(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

"(D) which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office.

"A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B). Rules similar to the rules of section 501(j) shall apply for purposes of this paragraph.

"'* * *

"(4) In the case of a contribution or gift by an individual, a domestic fraternal society, order, or association, operating under the lodge system, but only if such contribution or gift is to be used exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals."

for Cook's search on that date. Cook did obtain a warrant on May 9, 1986, based on the observations he made during his May 7 visit.

We begin our analysis by recognizing that "a search conducted without a warrant issued upon probable cause is *'per se* unreasonable * * * subject only to a few specifically established and well-delineated exceptions.' " *Schneckloth* v. *Bustamonte* (1973), 412 U.S. 218, 219 (quoting *Katz* v. *United States* [1967], 389 U.S. 347, 357). Consequently, evidence obtained in a warrantless search is generally inadmissible, and under the "fruit of the poisonous tree" doctrine, such evidence cannot serve as probable cause to support a subsequent warrant. *Segura* v. *United States* (1984), 468 U.S. 796, 804 (citing *Wong Sun* v. *United States* [1963], 371 U.S. 471, 484).[7] However, "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth, supra,* at 219 (citing *Davis* v. *United States* [1946], 328 U.S. 582, 593-594).

As the United States Supreme Court has held, "[t]he touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.' " *California* v. *Ciraolo* (1986), 476 U.S. 207, 211 (quoting *Katz, supra,* at 360). Accordingly, "[w]hat a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz, supra,* at 351. Entry into a home or office with the consent of the owner or occupier is thus not a "search" within the protec-

tion of the Fourth Amendment. *Maryland* v. *Macon* (1985), 472 U.S. 463, 469.

To rely on the consent exception of the warrant requirement, the state must show by "clear and positive" evidence that the consent was "freely and voluntarily" given. *Bumper* v. *North Carolina* (1968), 391 U.S. 543, 548; *State* v. *Danby* (1983), 11 Ohio App. 3d 38, 41, 11 OBR 71, 74, 463 N.E. 2d 47, 50. In *Schneckloth, supra,* at 227, the United States Supreme Court held that "whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of circumstances." Appellants argue that there was no voluntary consent here because Cook did not identify himself as a law enforcement officer and did not explain that his purpose was to investigate alleged illegal gambling. However, we find that under the totality of the circumstances, consent was freely and voluntarily given and there was no deception perpetrated.

Prior to the *Katz* "reasonable expectation of privacy" analysis the United States Supreme Court in several cases considered the consent issue in the context of so-called "deception." In the first of these cases, *Gouled* v. *United States* (1921), 255 U.S. 298, a business acquaintance of the defendant, acting under the orders of federal officers, entered the defendant's office on the pretense of a social visit. In the defendant's absence the acquaintance searched for and seized incriminating papers. The court held that the deceptive entry and the seizure were unconstitutional. But, see, *Warden* v. *Hayden* (1967), 387

---

[7] Because we find that Cook's entry on May 7 was lawful, we need not discuss whether there is independent evidence to support the May 9 warrant. *Segura, supra,* at 805.

U.S. 294 (rejecting the premises on which *Gouled* was based).

In the next case, *On Lee* v. *United States* (1952), 343 U.S. 747, the government placed a body microphone on an acquaintance of the defendant in an attempt to get the defendant to incriminate himself. The court held that the taped conversation was admissible, as the acquaintance was on the defendant's premises with consent and thus there was no "trespass." This case was followed by *Lopez* v. *United States* (1963), 373 U.S. 427, when the court found no constitutional violation where an IRS agent wore a body microphone and obtained incriminating statements from the defendant who had previously bribed the agent.

Finally, in 1966 the court sustained consensual entries of undercover officers in two cases. In *Lewis* v. *United States* (1966), 385 U.S. 206, a federal narcotics agent expressed a willingness to purchase narcotics and was twice invited into the defendant's home to consummate the sales. The court held that by inviting the agent into his home, "a commercial center * * * of * * * unlawful business," *id.* at 211, the defendant had consented to the agent's presence and thus to the use of the agent's testimony as to what had transpired. The *Lewis* case was decided the same day as *Hoffa* v. *United States* (1966), 385 U.S. 295, in which the court found that the defendant had no expectation of privacy, and thus no Fourth Amendment protection, relating to conversations heard by an invited guest who was in fact a paid government informant.

This court had occasion to review this line of cases in *State* v. *Pi Kappa Alpha Fraternity* (1986), 23 Ohio St. 3d 141, 23 OBR 295, 491 N.E. 2d 1129. In that case, liquor control agents were invited to enter a fraternity house when one agent purported to be an alumnus of another chapter and stated that his brother might be interested in joining the fraternity. Once inside the agents observed the illegal sale of alcohol. Following *Lewis* and *Gouled,* we held that the fraternity house manager had not freely and voluntarily consented to the agent's search. The key factors supporting this holding were set forth in the syllabus:

"Pursuant to Section 14, Article I of the Ohio Constitution, and in the absence of any judicially recognized exception to the warrant requirement, government officers are not privileged to deceptively gain entry into the private home or office of another without a warrant, where such home or office is not a commercial center of criminal activity, and where the invitation to enter the private home or office was not extended by the occupant for the purpose of conducting illegal activities."

Analyzing these key factors, we find the circumstances of this case to be significantly different from those in *Pi Kappa Alpha.* Here the only thing "deceptive" about Cook's entry was the fact that he did not openly identify himself as a law enforcement officer. He certainly did not affirmatively *misrepresent* his identity or lie to the doorkeeper about his intentions as did the liquor control agents in *Pi Kappa Alpha.* He entered the post as a guest of a member as could any member of the general public, and the fact that apparently no credentials were checked at the door is further indication that the FOE had no "reasonable expectation of privacy." *Commonwealth* v. *D'Onofrio* (1986), 396 Mass. 711, 488 N.E. 2d 410. Thus, this case is similar to *Macon, supra,* in which the United States Supreme Court held that an undercover officer's entrance into an adult bookstore by posing as a customer to make a buy did not violate

the Fourth Amendment. See, also, *Cleveland* v. *Mart* (1983), 10 Ohio App. 3d 210, 211-212, 10 OBR 284, 286, 461 N.E. 2d 316, 318.

The most important distinction between this case and the *Pi Kappa Alpha* case is the purpose for which the invitation to enter was extended. In *Pi Kappa Alpha,* "[t]he invitation extended by the fraternity house manager * * * was clearly made for the purpose of exhibiting the fraternity house with the probable goal of recruiting a potential member." *Id.* at 144, 23 OBR at 297, 491 N.E. 2d at 1132. There was no relationship between the invitation and the illegal sales of beer being conducted within the house.

By contrast, here, Cook and his informant companion were clearly invited into the club for the purpose of observing and engaging in the club's activities, including its gambling activities. Thus, this case is distinguishable from the many cases in which undercover police gain entrance to the defendant's premises by posing as individuals engaged in purely *legal* transactions. See *Pi Kappa Alpha, supra*; Annotation, Officer's Ruse to Gain Entry as Affecting Admissibility of Plain View Evidence — modern cases (1986), 47 A.L.R. 4th 425. Unlike *Pi Kappa Alpha,* the United States Supreme Court's decision in *Lewis* is directly on point here, as are other cases which found no Fourth Amendment violation where an undercover officer posed as a participant in the illegal activity being investigated. See, *e.g., United States* v. *Goldstein* (N.D. Ill. 1985), 611 F. Supp. 624; *United States* v. *Osorio de Santiago* (D. P.R. 1986), 626 F. Supp. 329, affirmed (C.A. 1, 1987), 828 F. 2d 866.

Accordingly, we hold that when an individual gives consent to another to enter a private area wherein illegal activities are being conducted, the consent does not lose its status of being freely and voluntarily given merely because it would not have been given but for the fact that the other person failed to identify himself as a police officer or agent.

### III

In summary, we hold that the trial court incorrectly granted appellants' motions to dismiss, as a nonprofit corporation can be found guilty of gambling for profit and R.C. 2915.02 does not deny equal protection of the laws to subsection 501(c)(8) organizations such as appellant FOE. We also hold that the trial court correctly overruled appellants' motions to suppress, as Detective Cook's entry into the lodge was not deceptive.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., LOCHER and H. BROWN, JJ., concur.

SWEENEY, HOLMES and DOUGLAS, JJ., concur in part and dissent in part.

SWEENEY, J., concurring in part and dissenting in part. I must respectfully dissent from the majority's disposition of the search and seizure issue presented in the case *sub judice* because the majority ignores basic constitutional imperatives and the applicable decisional law enunciated by this court and the federal judiciary.

The majority correctly acknowledges that searches conducted without the authorization of a valid search warrant are not favored in the law. See *G.M. Leasing Corp.* v. *United States* (1977), 429 U.S. 338, 352-353; *Camara* v. *Municipal Court* (1967), 387 U.S. 523, 528-529; *Stoner* v. *California* (1964), 376 U.S. 483, 486; *United*

*States* v. *Jeffers* (1951), 342 U.S. 48, 51-52; *McDonald* v. *United States* (1948), 335 U.S. 451, 454-455; and *Agnello* v. *United States* (1925), 269 U.S. 20, 32-33.

Nevertheless, the majority concludes that the "consent" to search in the present case obviated the necessity of a warrant. A review of the facts of this case in the context of prior state and federal decisions reveals that the majority is grossly mistaken.

While actual consent to search is a recognized exception to the warrant requirement, the government bears the burden of demonstrating that the consent was "freely and voluntarily given." *Bumper* v. *North Carolina* (1968), 391 U.S. 543, 548. See, also, *Gatlin* v. *United States* (C.A.D.C. 1963), 326 F. 2d 666, 673; and *Judd* v. *United States* (C.A.D.C. 1951), 190 F. 2d 649, 650-651. Such burden is not met where consent is predicated upon mere acquiescence in a search. *Bumper* v. *North Carolina, supra,* at 548-549; *Johnson* v. *United States* (1948), 333 U.S. 10, 13; *United States* v. *Rothman* (C.A. 9, 1973), 492 F. 2d 1260, 1265; and *United States* v. *Davis* (C.A. 9, 1973), 482 F. 2d 893. Similarly, consent may not be implied merely because governmental entry was occasioned by the absence of physical obstructions. Thus, in *Keiningham* v. *United States* (C.A.D.C. 1960), 287 F. 2d 126, 130, the federal appellate court observed: "We think that a person's right to privacy in his home (and the limitation of authority to a searching police officer) is governed by something more than the fortuitous circumstance of an unlocked door * * *." See, also, *State* v. *Akron Airport Post No. 8975* (1985), 19 Ohio St. 3d 49, 51, 19 OBR 42, 43, 482 N.E. 2d 606, 608; *Smith* v. *United States* (C.A.D.C. 1965), 353 F. 2d 877, 881 (Edgerton, J., concurring); *Nueslein* v. *Dist. of Columbia* (C.A.D.C. 1940), 115 F. 2d 690.

Similarly, where actual consent is expressed but elicited through artifice, it cannot be deemed to be unequivocal, specific and freely and intelligently given. Such is the clear holding of this court in *State* v. *Pi Kappa Alpha Fraternity* (1986), 23 Ohio St. 3d 141, 23 OBR 295, 491 N.E. 2d 1129. The syllabus thereto provides as follows:

"Pursuant to Section 14, Article I of the Ohio Constitution, and in the absence of any judicially recognized exception to the warrant requirement, government officers are not privileged to deceptively gain entry into the private home or office of another without a warrant, where such home or office is not a commercial center of criminal activity, and where the invitation to enter the private home or office was not extended by the occupant for the purpose of conducting illegal activities."

*Pi Kappa Alpha* is wholly consistent with the view of the Fourth Amendment expressed by the United States Supreme Court that a warrantless search may not be predicated upon consent procured by stealth or deception. *Gouled* v. *United States* (1921), 255 U.S. 298, 306. Moreover, federal decisions have invalidated such searches whether founded upon active deception, *Gatewood* v. *United States* (C.A.D.C. 1953), 209 F. 2d 789, or the "silent misrepresentation" of governmental officers, *United States* v. *Tweel* (C.A. 5, 1977), 550 F. 2d 297, 299.

In *Fraternal Order of Eagles, No. 778* v. *United States* (C.A. 3, 1932), 57 F. 2d 93, revenue agents gained access to the premises of a fraternal organization through the use of fraudulent membership cards. The Third Circuit Court of Appeals, finding the subsequent search and seizure illegal, remarked:

"A search made as the result of an entry by physical force is not necessary in order to violate the Fourth Amend-

ment. That amendment was designed to protect the individual against the abuse of official authority. A search and seizure following an entry into the house or office of a person suspected of crime by means of fraud, stealth, social acquaintance, or under the guise of a business call are unreasonable and violate the Fourth Amendment." *Id.* at 94.

The facts of *Fraternal Order of Eagles, No. 778* are virtually identical to those presented at bar. In the case *sub judice,* the deputy sheriff and his companion entered the premises unimpeded and observed devices which they perceived to be gambling paraphernalia. The record is inconclusive as to the motivating factors behind the decision to permit entry to the lodge. Whether entry was procured through the presentation of membership credentials or obtained irrespective thereof is of no legal significance. Assuming *arguendo* that entry was accompanied by mere acquiescence on the part of the club members or that the deputy simply availed himself of an "open door," such circumstances do not constitute a valid consent to search. It is therefore immaterial whether membership credentials would have been requested had they not been immediately presented to the person from whom entry was secured.

The majority has sought to distinguish the facts of this case from those presented in *Pi Kappa Alpha.* To do so, the majority has indulged in the assumption that the law enforcement officer was actively solicited to enter the club "for the purpose of observing and engaging in the club's activities, including its gambling activities." There is nothing in the record to support this assertion.[8] If any reasonable assumption is to be drawn from the interchange between the officer and his companion and the doorkeeper, it is that admittance was granted as a result of the membership credentials presented at that time. Thus, the deception employed by the officer in the case *sub judice* is factually indistinguishable from that practiced by the liquor agent in *Pi Kappa Alpha.* The most puzzling aspect of the majority opinion is its reliance upon the language of *Pi Kappa Alpha* that the invitation to enter in that case was extended "for the purpose of exhibiting the fraternity house with the probable goal of recruiting a potential member." *Id.* at 144, 23 OBR at 297, 491 N.E. 2d at 1132. In contrast, the present case involves an effort to accommodate a purported member in the enjoyment of benefits conferred by an existing membership — the ability to patronize a particular liquor establishment presumably possessing a D-4 permit. (See R.C. 4303.17.) This, indeed, is a most important distinction! In reality, the majority's tortured logic produces nothing more than a distinction without a difference.

Apparently, the majority places great reliance upon the fact that the credentials were not presented by the officer but by his companion. Thus, it is the conclusion of the majority that the officer "entered the post as a guest of a member as could any member of the general public." The crucial distinction, however, is that the officer was *not* a member of the general public but deceived the post into thinking that he was. This active deception to gain entry is what distinguishes this case from those in which an officer is solicited to

---

[8] There is likewise no support in the record for the bald statement by the majority that "no credentials were checked at the door." While no credentials were requested, they were presented and presumably the doorkeeper took notice of this fact.

432

engage in criminal activities — a distinction clearly recognized in *Pi Kappa Alpha*. Applying the logic of the majority, there is nothing preventing a law enforcement officer from applying for and receiving membership in any number of fraternal organizations since so can "any member of the general public." Accordingly, admittance predicated upon presentation of such credentials would, in the majority's view, be deemed consensual despite the clear holding of *Fraternal Order of Eagles, No. 778, supra*. It is less than comforting to know that, through such a process, the constitutional protections afforded by Section 14, Article I of the Ohio Constitution and the Fourth Amendment to the United States Constitution may be purchased clandestinely by the authorities.

One final aspect of this case is also worth noting. The majority correctly acknowledges that " 'a search conducted without a warrant issued upon probable cause is "per se" unreasonable. * * *' " The majority further concedes that the informant accompanying Detective Cook had been a reliable source of information in the past. Nevertheless, the state failed to seek a search warrant based upon the information provided. In support of the decision to forego any attempt to secure a search warrant, appellees indicate that a warrant under the circumstances at bar could not have been obtained. Appellees apparently are suggesting that the information regarding gambling activities on the subject premises provided by the informant was insufficient for a judicial officer to conclude that probable cause of criminal activity existed and that issuance of a search warrant was justified. In my view, this argument is not persuasive. If probable cause to search was lacking, the employment of subterfuge to obviate the need for a warrant should not remedy the deficiency. As succinctly stated by the federal appellate court in *Nueslein* v. *Dist. of Columbia, supra*, at 693: "The absence of a search warrant could scarcely make good an entry for which no warrant could have been obtained."

Nevertheless, the majority has countenanced a search unauthorized by a warrant and totally unsupported by probable cause, but instead justified by a misplaced reliance upon "consent" procured by deception. In so doing, the decision reduces constitutional protections to a game of bluff which would rival any of the activities to which R.C. Chapter 2915 is directed. Unfortunately, the stakes in this case are much higher. I would reverse the denial of the motions to suppress.

HOLMES and DOUGLAS, JJ., concur in the foregoing opinion.