[Cite as *State v. Hartman*, 2012-Ohio-4694.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

JUDY ANN HARTMAN

    Appellant

C.A. No.    26250

APPEAL FROM JUDGMENT
ENTERED IN THE
BARBERTON MUNICIPAL COURT
COUNTY OF SUMMIT, OHIO
CASE Nos.    11 CRB 01141
                 11 CRB 01159
                 11 CRB 02943 (A) & (B)
                 11 CRB 02944

DECISION AND JOURNAL ENTRY

Dated: October 10, 2012

        BELFANCE, Judge.

**{¶1}** Defendant-Appellant Judy Ann Hartman appeals from the decisions of the Barberton Municipal Court. For the reasons set forth below, we affirm.

I.

**{¶2}** On May 11, 2011, Summit County humane officers Tim Harlan and Shannon O'Herron received a call requesting them to check on the welfare of two dogs being housed in a van located on a property on Jarvis Road. The caller was concerned because it was an excessively hot day. When they arrived, the officers found no one at the house. However, they heard multiple dogs barking inside and were overwhelmed by the stench of ammonia and animal waste coming from inside the residence.

**{¶3}** The van had an electrical cord running into it from the house, the front windows were down, and the side windows were open a few inches. Officers tried to reach the owner via

a number on the side of the van but were unable to reach anyone. The officers heard noises coming from inside the van and opted to open it. The van contained two dogs which were heavily panting. Officer Harlan estimated that the temperature of the van was approximately five to ten degrees warmer than the outside air, despite the small fan that was running inside the van. After the officers had already removed the animals from the property, Ms. Hartman returned the officers' phone calls. The officers notified Ms. Hartman that they would have to come back to the property to see the rest of the animals.

{¶4} Officers returned to the property the following day. At first, they thought that no one was home again. Officers then noticed a black truck at the back of the property. Officers found Ms. Hartman in the truck; Officer Harlan felt she was either in a very deep sleep or was deceased. After Officer Harlan tried unsuccessfully to awake her, he called EMS. When EMS arrived, EMS personnel were not going to transport Ms. Hartman because they did not think anything was wrong and thought she was in a deep sleep; however, after an apparent suicide note was discovered, EMS thought it best to take her to the hospital. Prior to placing Ms. Hartman on a stretcher, she woke up, was able to stand, and was able to have a conversation with sheriff deputies and Officer O'Herron while she was in back of the ambulance on the stretcher. Ms. Hartman advised Officer O'Herron that she could go into the house. Ms. Hartman indicated that the front door was unlocked and that there were keys in the vehicle in case officers needed to get into the tractor-trailer on the property which contained dog food. Ms. Hartman requested that officers go in and check on the animals. The sheriff deputy specifically asked Ms. Hartman if the officers could go in and she said yes.

{¶5} Officers went into the house and confronted what Officer Harlan described as the worst smell of ammonia and waste that he had ever smelled in his 17 years of working as a

humane officer. Officers discovered filthy cages containing various animals along with waste covered floors. In addition, officers discovered several animals running loose in the house. The smell from the house required officers to exit the residence at times to get fresh air. Officers encountered 40 dogs, 24 cats, 25 birds, an iguana, two ferrets, and six mice on the property.

{¶6} Multiple complaints were filed against Ms. Hartman in four separate case numbers. Some of the counts were subsequently amended. Case number 11 CRB 1141 was dismissed after Ms. Hartman agreed to surrender her animals to the Humane Society of Greater Akron. Case number 11 CRB 2943 contained two counts, count A alleged a violation of R.C. 959.131(C)(1) concerning 25 birds, one iguana, two ferrets, and six mice, while count B alleged a violation of R.C. 959.131(C)(1) with respect to 24 cats. Case number 11 CRB 2944 alleged a violation of R.C. 959.131(C)(1) with respect to the two dogs in the van. Case number 11 CRB 1159 alleged a violation of R.C. 959.131(C)(1) concerning 40 dogs.

{¶7} On December 7, 2011, Ms. Hartman filed a motion to suppress, asserting that the warrantless search was conducted without valid consent and that there were no exigent circumstances justifying the search of her home. Ultimately, the three remaining cases were tried together to the court. Evidence concerning the motion to suppress was heard at the same time.

{¶8} The trial court denied Ms. Hartman's motion to suppress and found her guilty of each of the four counts. Ms. Hartman's sentence was stayed pending appeal. This Court's record was supplemented with a judgment entry reflecting the disposition of all of the counts.

{¶9} Ms. Hartman now appeals, raising two assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN DENYING APPELLANT HARTMAN'S
MOTION TO SUP[P]RESS THE EVIDENCE OBTAINED FROM THE
WARRANTLESS SEARCH OF HER HOME ABSENT HER VOLUNTARY
CONSENT OR AN EXIGENT CIRCUMSTANCE IN VIOLATION OF HER
RIGHT TO BE FREE FROM UNREASONABLE SEARCH AND SEIZURE
UNDER THE FOURTH AMENDMENT TO THE UNITED STATES
CONSTITUTION.

{¶10}  Ms. Hartman asserts in her first assignment of error that the trial court erred in denying her motion to suppress because she did not provide voluntary consent to search the home and there were no exigent circumstances.  We conclude that the trial court did not err in concluding that Ms. Hartman had voluntarily consented to officers entering her home.

{¶11}  The Supreme Court of Ohio has held that:

[a]ppellate review of a motion to suppress presents a mixed question of law and fact.  When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses.  Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence.  Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Internal citations omitted.)  *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶12}  "When police conduct a warrantless search, the state bears the burden of establishing the validity of the search.  Searches and seizures without a warrant are per se unreasonable except in a few well-defined and carefully circumscribed instances."  (Citation omitted.)  *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 98.  "It is equally well established, however, that a search of property without a warrant or probable cause but with proper consent having been voluntarily obtained does not violate the Fourth Amendment."  *Id.* "To rely on the consent exception of the warrant requirement, the state must show by clear and

positive evidence that the consent was freely and voluntarily given." (Citations omitted.) *State v. Posey,* 40 Ohio St.3d 420, 427 (1988); *see also State v. Hetrick*, 9th Dist. No. 07CA009231, 2008-Ohio-1455, ¶ 23.

**{¶13}** "The question of whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Roberts* at ¶ 99. "The standard for measuring the scope of consent under the Fourth Amendment is objective reasonableness, i.e., what a typical reasonable person would have understood by the exchange between the officer and the suspect." *Id.*

**{¶14}** In the instant matter, the trial court concluded that Ms. Hartman knowingly and voluntarily consented to the humane officers entering her home and that the evidence discovered was in plain view. We note that Ms. Hartman does not challenge the scope of the search or the trial court's analysis concluding that the evidence was in plain view upon entry into the home. *See Hetrick* at ¶ 23 ("Consent to enter premises does not also extend to consent to search the premises."). Instead, Ms. Hartman argues that, under the circumstances, her consent allowing the officers to enter the home to care for her animals was not voluntary.

**{¶15}** Officer Harlan testified that, on the date officers returned to the property, they found Ms. Hartman unconscious in a truck. Officer Harlan indicated that he was not sure if she was in a very deep sleep or deceased. Thus, EMS was called. Upon arriving, Officer Harlan testified that EMS was not going to transport Ms. Hartman to the hospital because it believed she was just in a deep sleep. However, once a possible suicide note was discovered, EMS thought it best to transport her.

**{¶16}** Prior to transport, Ms. Hartman awoke and was able to stand. Once in the ambulance, she was able to have a conversation with Officer O'Herron. Officer O'Herron

testified that Ms. Hartman was speaking with her and a sheriff deputy and advised them that officers could go in the house and that Ms. Hartman wanted them to go in and check on the animals. Ms. Hartman further advised officers that the front door was unlocked and explained where a key to the tractor trailer containing dog food was located. Officer O'Herron asserted that Ms. Hartman appeared competent, was fully conscious once she was inside the ambulance, and was inside the ambulance for approximately 20-25 minutes before it left. And while Ms. Hartman was provided with an oxygen mask while in the ambulance, she kept taking it on and off to talk with officers.

{¶17} The trial court's finding that Ms. Hartman's consent for officers to enter the home was voluntary is supported by competent, credible evidence. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8; *Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, at ¶ 99. At the time Ms. Hartman gave consent, there was evidence that Ms. Hartman was fully conscious and appeared competent. Moreover, Ms. Hartman was aware of the fact that she had animals in the house that needed care and had the mental clarity to inform officers of where the key to the trailer was located so that they might feed the animals. Thus, in light of the argument made on appeal, we cannot conclude the trial court erred in denying Ms. Hartman's motion to suppress. We overrule Ms. Hartman's first assignment of error.

## ASSIGNMENT OF ERROR II

AS TO COUNT TWO (11 CRB 02943(A)), THE TRIAL COURT ERRED IN CONVICTING APPELLANT HARTMAN OF NEGLIGENTLY COMMITTING AN ACT OF CRUELTY AGAINST A COMPANION ANIMAL AS THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT APPELLANT HARTMAN COMMITTED THE ACT AGAINST A COMPANION ANIMAL PER R.C. 959.131(A)(1) AND R.C. 1531.01(X), DEPRIVING APPELLANT HARTMAN OF HER RIGHTS UNDER SECTION 16, ARTICLE I OF THE OHIO CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT.

{¶18}   Ms. Hartman asserts in her second assignment of error that her conviction for cruelty against companion animals in case number 11 CRB 2943(A) with respect to the 25 birds, one iguana, two ferrets, and six mice is based upon insufficient evidence because the State failed to prove beyond a reasonable doubt that any of the animals were companion animals.  The count of the complaint at issue alleges that Ms. Hartman committed an act of cruelty against one or more of the listed animals.  Thus, if this Court concludes that there was sufficient evidence that one of the animals was a companion animal then Ms. Hartman's conviction must be affirmed.  Ms. Hartman does not assert that the other elements of the crime were not established beyond a reasonable doubt.  Because we conclude that at least one of the birds was a companion animal as defined by the statute, we conclude that there was sufficient evidence whereby the trier of fact could find Ms. Hartman guilty of the charge.

{¶19}   In determining whether the evidence presented was sufficient to sustain a conviction, this Court reviews the evidence in a light most favorable to the prosecution.  *State v. Jenks*, 61 Ohio St.3d 259, 274 (1991).  Furthermore:

> [a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.  The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶20}   Ms. Hartman was found guilty of violating R.C. 959.131(C)(1).  That section provides that "[n]o person who confines or who is the custodian or caretaker of a companion animal shall negligently * * * [t]orture, torment, needlessly mutilate or maim, cruelly beat, poison, needlessly kill, or commit an act of cruelty against the companion animal[.]"  R.C.

959.131(C)(1). On appeal, Ms. Hartman asserts that the State failed to establish that any of the animals identified in this count of the complaint were companion animals as that term has been defined.

{¶21} "'Companion animal' means any animal that is kept inside a residential dwelling and any dog or cat regardless of where it is kept. 'Companion animal' does not include livestock or any wild animal." R.C. 959.131(A)(1). Here, Ms. Hartman does not dispute that there was evidence that the birds at issue were kept inside a residential dwelling. Instead, she asserts that the State did not establish that the birds were not wild animals.

{¶22} "'Wild animal' has the same meaning as in section 1531.01 of the Revised Code." R.C. 959.131(A)(5). R.C. 1531.01(X) provides that "'[w]ild animals' includes mollusks, crustaceans, aquatic insects, fish, reptiles, amphibians, wild birds, wild quadrupeds, and all other wild mammals, but does not include domestic deer." "'Wild birds' includes game birds and nongame birds." R.C. 1531.01(Q). Game birds are further defined as including

> mourning doves, ringneck pheasants, bobwhite quail, ruffed grouse, sharp-tailed grouse, pinnated grouse, wild turkey, Hungarian partridge, Chukar partridge, woodcocks, black-breasted plover, golden plover, Wilson's snipe or jacksnipe, greater and lesser yellowlegs, rail, coots, gallinules, duck, geese, brant, and crows.

R.C. 1531.01(S). Whereas nongame birds are defined as including "all other wild birds not included and defined as game birds or migratory game birds." R.C. 1531.01(T). Migratory game birds are defined as including "waterfowl (Anatidae); doves (Columbidae); cranes (Gruidae); cormorants (Phalacrocoracidea); rails, coots, and gallinules (Rallidae); and woodcock and snipe (Scolopacidae)." R.C. 1531.01(AAA).

{¶23} While not all of the birds listed in the complaint were discussed, some of them were. Officer Harlan discussed many of the animals he found upon entering the residence. Specifically he testified that the birds found in the house in the cages included cockatiels,

macaws, parrots, parakeets, and cockatoos. In addition, Officer Harlan testified concerning several exhibits which included pictures of the birds in cages. The exhibits were admitted, and, thus, the trial court was able to observe the birds that were discussed and the conditions in which they were living.

{¶24} In light of the characterization of the birds as parrots, parakeets, macaws, cockatiels, and cockatoos, it is clear that the birds are not contemplated as being "game birds" or "migratory game birds" in light of the definition of those terms. *See* R.C. 1531.01(S),(AAA). Thus, the question remains whether the birds are nongame birds and, thus, wild birds. *See* R.C. 1531.01(Q), (T). As noted above, nongame birds are defined as including "all other wild birds not included and defined as game birds or migratory game birds." R.C. 1531.01(T). Given that the phrase, "all other wild birds[,] or "wild" itself, is not otherwise defined, we look to the common meaning of the word "wild." *See State v. Willan*, 9th Dist. No. 24894, 2011-Ohio-6603, ¶ 23, citing R.C. 1.42. Wild means "living in a state of nature and not ordinarily tame or domesticated[.]" *Merriam-Webster's Collegiate Dictionary* 1432 (11th Ed.2005). The evidence presented supports the reasonable inference that the birds at issue were domesticated and, thus, not wild. The birds listed by Officer Harlan are birds that would be familiar to the average person. It is within the common knowledge of the average person that birds such as parrots and parakeets are often kept in cages as pets. *See Newman v. Cleveland Museum of Natural History,* 143 Ohio St. 369, 378 (1944) (observing that fact that an elephant is a wild animal is a matter of common knowledge). Further, there was evidence that these particular birds discussed by Officer Harlan were kept inside a residence in cages alongside other companion animals, such as dogs and cats. *See* R.C. 959.131(A)(1). The trier of fact was able to view photographs of the birds and cages and the surroundings. Viewing the totality of the evidence in a light most

favorable to the State, we conclude there was evidence whereby a trier of fact could conclude beyond a reasonable doubt that at least one of the birds discussed by Officer Harlan was a companion animal as that term is defined by R.C. 959.131(A)(1). Accordingly, based on Ms. Hartman's limited argument on appeal, the conviction she challenges is not based upon insufficient evidence. Ms. Hartman's second assignment of error is overruled.

III.

**{¶25}** In light of the foregoing, we affirm the judgment of the Barberton Municipal Court.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Barberton Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

CARR, P. J.
DICKINSON, J.
CONCUR.

APPEARANCES:

J. DEAN CARRO, Appellate Review Office, School of Law, The University of Akron, for Appellant.

J. JEFFERY HOLLAND, Special Prosecuting Attorney, for Appellee.