[Cite as *State v. Guerrero-Sanchez*, 2017-Ohio-8185.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 27327 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-714 |
| | : | |
| JOSE R. GUERRERO-SANCHEZ | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 13th day of October, 2017.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
    Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, 120 West Second Street, Suite 706, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-appellant, Jose R. Guerrero-Sanchez, appeals from his conviction in the Montgomery County Court of Common Pleas after he pled no contest to two counts of aggravated possession of drugs. In support of his appeal, Guerrero-Sanchez contends the trial court erred by overruling his motion to suppress statements and evidence and by sentencing him to the maximum prison term for one of his offenses. For the reasons outlined below, the judgment of the trial court will be affirmed.

### Facts and Course of Proceedings

{¶ 2} On March 11, 2016, the Montgomery County Grand Jury returned an indictment charging Guerrero-Sanchez with two counts of aggravated possession of drugs in violation of R.C. 2925.11(A). The first count alleged that Guerrero-Sanchez possessed fentanyl in an amount equal to or exceeding 50 times the bulk amount, but less than 100 times the bulk amount, which is a felony of the first degree. The second count was a fifth-degree felony involving the possession of methamphetamine. The charges stemmed from Homeland Security Officers discovering a small plastic bag of methamphetamine and 1,063 grams of fentanyl in a hotel room occupied by Guerrero-Sanchez.

{¶ 3} After pleading not guilty to the charges, on April 18, 2016, Guerrero-Sanchez filed two motions to suppress. One of the motions was directed at the statements Guerrero-Sanchez made during his encounter with the officers, whereas the other motion was directed at the drug evidence seized in the hotel room. The trial court held a hearing on both motions on June 23, 2016, during which the State presented testimony from the

two Homeland Security Officers, Agent Raymond Swallen and Detective Josh Walters. Guerrero-Sanchez also testified at the hearing in his defense.

{¶ 4} At the hearing, Agent Swallen testified that on March 1, 2016, he was checking local hotels for illegal activity when he observed three men engaging in suspicious behavior outside the Comfort Inn at 42 Prestige Plaza in Miamisburg, Ohio. Swallen testified that he followed the men inside the Comfort Inn, but could not locate them. In an effort to try and identify the men, Swallen asked the desk clerk for the hotel's guest registration information. Swallen testified that when he checks guest registrations he typically looks for "local people or people connected to the border." Trans. (June 23, 2016), p. 35. When checking Comfort Inn's guest registration Swallen noticed one of the guests, Guerrero-Sanchez, had a Santa Ana, California address. Swallen testified that the address caught his attention because it was close to the border and near an area where he had made drug seizures.

{¶ 5} Next, Swallen testified that he ran Guerrero-Sanchez's name and address through federal data bases "DICE" and "DARTS." Swallen also contacted Agent Joe Belke and asked him to check Guerrero-Sanchez's phone number. According to Swallen, the data bases revealed that Guerrero-Sanchez's phone number was linked to a methamphetamine delivery. In light of this information, Swallen contacted Detective Walters and advised him that he wanted to do a "knock and talk" at Guerrero-Sanchez's hotel room. *Id.* at 36. Swallen testified that a "knock and talk" is "where you knock on the door and ask somebody if they're willing to talk to you." *Id.*

{¶ 6} After Walters arrived on the scene, Swallen testified that he walked up to room 308 at the Comfort Inn and knocked on the door. According to Swallen, Guerrero-

Sanchez opened the door 10 to 15 seconds after he knocked. Upon Guerrero-Sanchez opening the door, Swallen testified that he identified himself as a law enforcement officer and showed Guerrero-Sanchez his Homeland Security credentials. Swallen then asked Guerrero-Sanchez if he could talk to him and if he would let him in the hotel room. Swallen testified that Guerrero-Sanchez verbally responded "yes," opened the door, and then motioned for Swallen to come inside the room.

{¶ 7} When Swallen walked into the hotel room he immediately observed a black gun sitting on a desk. Swallen testified that he asked Guerrero-Sanchez if the gun was his and Guerrero-Sanchez verbally answered "no, that's a BB gun." Trans. (June 23, 2016), p. 38. Detective Walters, who was standing in the hallway listening to the conversation, testified that when he heard Swallen ask about a gun he walked into the room as well.

{¶ 8} After asking about the gun, Swallen testified that Guerrero-Sanchez put on a pair of jeans and sat on the couch in the hotel room. Thereafter, Swallen asked Guerrero-Sanchez to turn on the light located behind him and Guerrero-Sanchez complied without hesitation. Swallen then asked if there were any more lights, and Guerrero-Sanchez pointed to a light by the bed, which Swallen turned on. When all the lights were turned on, Swallen testified that he observed a glass pipe and a small plastic bag containing a crystal-like substance that appeared to be methamphetamine on a nightstand between the two beds in the hotel room. Upon seeing the methamphetamine, Swallen testified that he asked Guerrero-Sanchez if he would allow him to search the hotel room, and Guerrero-Sanchez responded "yes." *Id.* at 40.

{¶ 9} Once he obtained Guerrero-Sanchez's consent to search the hotel room,

Swallen looked around the room and observed a box for a digital scale, vacuum sealed bags, and a suitcase with a lock on it. Swallen testified that he asked Guerrero-Sanchez if he had a key to the suitcase and that Guerrero-Sanchez provided him with a key. When Swallen unlocked and opened the suitcase he observed a block wrapped up in tinfoil that appeared to be United States currency and drugs, later identified as fentanyl, banded together.

{¶ 10} Swallen testified that he asked Guerrero-Sanchez about the drugs in the suitcase and that Guerrero-Sanchez responded "it's not mine, there was two other people here last night and it was the females." Trans. (June 23, 2016), p. 40. Swallen testified that there was no evidence of anyone else being in the hotel room, as Guerrero-Sanchez was in the room alone and only one of the beds appeared to have been slept in.

{¶ 11} Continuing, Swallen testified that throughout the encounter, Guerrero-Sanchez had no difficulty understanding English or answering his questions. Swallen testified that Guerrero-Sanchez never asked him to repeat himself and that Guerrero-Sanchez responded to his questions in an immediate, conversational pace without delay. Despite there being no indication of a language barrier, Swallen testified that once he asked Guerrero-Sanchez about the drugs in the suitcase, Guerrero-Sanchez suddenly claimed he could not speak English.

{¶ 12} Swallen further testified that no weapons were drawn or displayed during the encounter, which he claimed lasted only 20 minutes. Detective Walters also confirmed that no weapons were drawn during the encounter and testified that Guerrero-Sanchez permitted Swallen inside the hotel room and consented to a search. Detective Walters also confirmed that Guerrero-Sanchez provided Swallen with a key to the

suitcase containing the fentanyl and that Guerrero-Sanchez appeared to speak and understand English without difficulty.

{¶ 13} Both Swallen and Walters testified that Guerrero-Sanchez was not *Mirandized* during the encounter at the hotel room. However, both officers testified that Guerrero-Sanchez was not handcuffed or placed in custody prior to the search of the suitcase. Walters specifically testified that Guerrero-Sanchez was handcuffed prior to being transported to the office of the Drug Enforcement Agency ("DEA") for questioning. Walters also testified that while transporting Guerrero-Sanchez, he did not ask him about the drugs found in the hotel room, but only discussed the benefits of cooperating with law enforcement. Walters testified that once Guerrero-Sanchez arrived at the DEA office, a Spanish-speaking agent read him his *Miranda* rights and Guerrero-Sanchez thereafter requested to speak to an attorney.

{¶ 14} Guerrero-Sanchez testified to a much different version of events. Through a Spanish-speaking interpreter, Guerrero-Sanchez testified that on the day in question, he was sleeping when he woke up to a knock on his hotel-room door. He claimed that he initially did not see anyone through the peephole of the door, so he went back to sleep, but then heard someone knock again. When he finally opened the door, Guerrero-Sanchez claimed that it was Detective Walters who had been knocking.

{¶ 15} Upon opening the door, Guerrero-Sanchez testified that Walters and Swallen pushed him into the room and sat him on the sofa while he was wearing only his underwear. Thereafter, Guerrero-Sanchez testified that Walters and Swallen started searching the hotel room. During the search, Guerrero-Sanchez testified that the officers moved around the beds and mattresses and found the suitcase in question. According

to Guerrero-Sanchez, the suitcase did not require a key to be opened. Guerrero-Sanchez claimed that he could not have handed the officers a key because he was handcuffed during the search.

{¶ 16} Guerrero-Sanchez also testified that the officers continually asked him "where's the money?" Trans. (June 23, 2016), p. 62. Guerrero-Sanchez testified that he does not speak or understand even a small amount of English, and that he only recognized the word "money" during the encounter. As a result, Guerrero-Sanchez testified that he did not understand what the officers were asking him and that he did not know his rights or whether his rights were ever explained to him. He claimed a Spanish-speaking officer was not provided until after he was transported to the DEA office.

{¶ 17} With respect to his background, Guerrero-Sanchez testified that he is 36 years old and has lived and worked in the United States for 16 years, mostly in California. He testified that Spanish is his primary language and that he was educated in Mexico where he completed 11 years of schooling. Guerrero-Sanchez also testified that he came to Dayton to look for a place to live, and that he was able to drive himself from California to Dayton despite his alleged language barrier.

{¶ 18} After the foregoing testimony was heard by the trial court, on August 25, 2016, a supplemental suppression hearing was held at the request of the State. At the supplemental hearing, the State presented testimony from Officer Jeremiah Lockhart. Officer Lockhart testified that he is a corrections officer at the Montgomery County Jail and that Guerrero-Sanchez is an inmate worker in the "B Pod" of the jail. Lockhart testified that he has personally interacted with Guerrero-Sanchez over the past five months for four to five days a week, and that all their interactions have been conducted

in English, with the exception of the occasional Spanish greeting "Buenos Dias." According to Lockhart, Guerrero-Sanchez demonstrated no difficulty understanding or speaking English. Furthermore, Lockhart testified that Guerrero-Sanchez spoke and understood English well enough to serve as a translator for his Spanish-speaking cellmate.

{¶ 19} On October 3 and 24, 2016, the trial court issued a written decision and entry overruling Guerrero-Sanchez's motion to suppress his statements. On October 27, 2016, the trial court also issued a written decision and entry overruling Guerrero-Sanchez's motion to suppress the drug evidence seized from the hotel room. As a result of the trial court's decision, Guerrero-Sanchez pled no contest to the charges in the indictment and the trial court found him guilty as charged.

{¶ 20} For the first-degree-felony count of aggravated possession of drugs involving fentanyl, the trial court sentenced Guerrero-Sanchez to the maximum prison term of 11 years. In sentencing him to the maximum prison term, the trial court found that Guerrero-Sanchez had committed the worst form of the offense given the amount and type of drug, and the fact that the drug has caused several overdose deaths in Montgomery County.

{¶ 21} For the fifth-degree-felony count of aggravated possession of drugs involving methamphetamine, the trial court sentenced Guerrero-Sanchez to 12 months in prison. The trial court ordered the 12-month prison term to be served concurrently with the 11-year prison term for a total sentence of 11 years in prison.

{¶ 22} Guerrero-Sanchez now appeals from his conviction and sentence, raising two assignments of error for review.

**First Assignment of Error**

{¶ 23} Guerrero-Sanchez's First Assignment of Error is as follows:

THE TRIAL COURT ERRED WHEN IT OVERRULED GUERRERO-SANCHEZ'S MOTION TO SUPPRESS.

{¶ 24} Under his First Assignment of Error, Guerrero-Sanchez contends that the trial court erred in overruling the motion to suppress his statements and the drug evidence discovered in his hotel room. In support of this claim, Guerrero-Sanchez contends that his statements should have been suppressed because they were involuntary as a result of him not understanding English and were made without the benefit of *Miranda* warnings. He also claims that the drugs discovered in his hotel room should have been suppressed because he did not voluntarily consent to the search of his hotel room.

*Standard of Review*

{¶ 25} "In ruling on a motion to suppress, the trial court 'assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses.' " *State v. Prater*, 2012-Ohio-5105, 984 N.E.2d 36, ¶ 7 (2d Dist.), quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994). "As a result, when we review suppression decisions, 'we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard.' " *Id.*, quoting *Retherford*.

### *Guerrero-Sanchez's Statements Were Voluntary*

**{¶ 26}** Guerrero-Sanchez first claims the statements he made to Agent Swallen and Detective Walters should have been suppressed because his statements were involuntary due to his inability to understand the English language.

**{¶ 27}** "Whether a statement was made voluntarily and whether an individual knowingly, voluntarily, and intelligently waived his or her *Miranda* rights are distinct issues." (Citations omitted.) *State v. Lovato*, 2d Dist. Montgomery No. 25683, 2014-Ohio-2311, ¶ 30. "Regardless of whether *Miranda* warnings were required and given, a defendant's statement may have been given involuntarily and thus be subject to exclusion." *Id.*, citing *State v. Kelly*, 2d Dist. Greene No. 2004-CA-20, 2005-Ohio-305, ¶ 11.

**{¶ 28}** "In determining whether a pretrial statement is involuntary, a court 'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.' " *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 13, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, *overruled on other grounds*, *Edwards v. Ohio*, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

**{¶ 29}** " '[C]oercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.' " *State v. Banks-Harvey*, 2d Dist. Montgomery No. 26786,

2016-Ohio-4715, ¶ 8, quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). " 'Evidence of use by the interrogators of an inherently coercive tactic (e.g., physical abuse, threats, deprivation of food, medical treatment, or sleep) will trigger the totality of the circumstances analysis.' " *Id.*, quoting *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). "A confession is voluntary 'absent evidence that [the defendant's] will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct.' " *Id.*, quoting *State v. Jackson*, 2d Dist. Greene No. 02CA0001, 2002-Ohio-4680, ¶ 20. (Other citation omitted.)

{¶ 30} In this case, the trial court indicated that its decision to overrule the motion to suppress Guerrero-Sanchez's statements was based on the credibility of the witnesses. Accordingly, it is clear from the record that the trial court found the officers' testimony more credible than Guerrero-Sanchez's and relied on the officers' testimony when issuing its decision.

{¶ 31} The testimony of Agent Swallen, Detective Walters, and Officer Lockhart indicate that Guerrero-Sanchez understands and speaks the English language. Specifically, Swallen and Walters testified that Guerrero-Sanchez communicated with them in English throughout the encounter without a problem and that Guerrero-Sanchez did not mention a language barrier until after Swallen asked him about the drugs in the suitcase. Guerrero-Sanchez's ability to speak and understand English is buttressed by the testimony of Officer Lockhart, who testified that Guerrero-Sanchez had no difficulty understanding and speaking English with him while incarcerated at the Montgomery County Jail, and that Guerrero-Sanchez acted as an English translator for his Spanish-speaking cellmate. We also note that Guerrero-Sanchez testified that he has been living

in the United States for 16 years, almost half his life, and that he has been able to obtain employment and travel across the country without any difficulty. Accordingly, there is competent and credible evidence in the record supporting the finding that Guerrero-Sanchez understood what the offers were saying during the encounter at the hotel room.

{¶ 32} We further note that the officers' testimony also indicates that the encounter in the hotel room was not coercive in nature. There is no indication that Guerrero-Sanchez was subject to any threats or mistreatment. Moreover, the officers testified that the whole encounter lasted no more than 20 minutes without any weapons drawn, and that Guerrero-Sanchez was not handcuffed until he was transported to the DEA office.

{¶ 33} When considering the officers' testimony, the totality of the circumstances do not indicate that Guerrero-Sanchez's statements were rendered involuntary as the result of a language barrier or any coercive police conduct. Rather, the totality of the circumstances indicate that Guerrero-Sanchez understands and speaks the English language at a level sufficient to have understood Swallen's questions and that he voluntarily complied with the officers at the hotel room and answered their questions.

{¶ 34} For the foregoing reasons, Guerrero-Sanchez's argument that his statements were involuntary and should have been suppressed is overruled.


### *Guerrero-Sanchez's Statements Are Not Suppressible Under Miranda*

{¶ 35} Guerrero-Sanchez also contends that his statements to Agent Swallen and Detective Walters should have been suppressed because the officers failed to administer *Miranda* warnings.

{¶ 36} "*Miranda* [*v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)]

requires police to give a suspect certain prescribed warnings before custodial interrogation commences and provides that if the warnings are not given, any statements elicited from the suspect through police interrogation in that circumstance must be suppressed." *State v. Petitjean*, 140 Ohio App.3d 517, 523, 748 N.E.2d 133 (2d Dist.2000). Police are not required to administer *Miranda* warnings to every person they question, even if the person being questioned is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997), citing *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). Rather, *Miranda* warnings are required only for custodial interrogations. *Id.*, citing *Mathiason* at 494. (Other citation omitted.)

{¶ 37} "An individual is in custody when there has been a formal arrest or a restraint of freedom of movement such that a reasonable man would believe that he is under arrest." *State v. Wenzler*, 2d Dist. Greene No. 2003-CA-16, 2004-Ohio-1811, ¶ 15, citing *Biros* at 440. "The subjective views of the interviewing officer and the suspect are immaterial to the determination of whether a custodial interrogation was conducted." (Citations omitted.) *In re L.G.*, 2017-Ohio-2781, 82 N.E.3d 52, ¶ 13 (2d Dist.). "The inquiry whether a person is subject to custodial interrogation is an objective question, focusing on how a reasonable person in the suspect's position would have understood the situation." (Citations omitted.) *Id.* "General, on-the-scene questioning of persons concerning events that have happened does not ordinarily fall within the ambit of custodial interrogation, because the compelling atmosphere inherent in the process of in-custody interrogation is not present." *State v. Barnett*, 2d Dist. Montgomery No. 14019, 1994 WL 567551, *4 (Aug. 31, 1994), citing *Miranda* at 477-478.

{¶ 38} As previously noted, the trial court relied on the officers' testimony when

overruling Guerrero-Sanchez's motion to suppress his statements. In applying the officers' testimony to the relevant law, we find that Guerrero-Sanchez's statements were not elicited during a custodial interrogation, as a reasonable person in Guerrero-Sanchez's position would not have believed that he was under arrest at the time the statements were made.

{¶ 39} According to the officers' testimony, Guerrero-Sanchez permitted the officers inside the hotel room after Agent Swallen knocked on the door, identified himself, and asked to speak with him. After Guerrero-Sanchez answered the door, he put on a pair of jeans, sat on the couch, and proceeded to communicate with the officers voluntarily while under no physical constraints or threats of force. We note that after Swallen saw the glass pipe and methamphetamine on the nightstand, he proceeded to ask for Guerrero-Sanchez's permission to search the hotel room as opposed to arresting him or physically constraining him in anyway. As a further matter, neither Swallen nor Walters had their weapon drawn or showing during the encounter. Most importantly, the officers indicated that Guerrero-Sanchez was not placed in handcuffs until after the drugs were discovered in the suitcase. Accordingly, the officers' testimony indicates that Guerrero-Sanchez was not in custody until after the fentanyl was found. As a result, the statements elicited from Guerrero-Sanchez prior to those drugs being found were not obtained in violation of *Miranda*.

{¶ 40} The officers' testimony also indicates that once Guerrero-Sanchez was in custody he was not asked any further questions about the drugs found at the hotel room. Rather, Detective Walters testified that the only discussion he had with Guerrero-Sanchez after he was in custody concerned the benefits of cooperating with the authorities. We

find that said discussion does not qualify as an interrogation requiring *Miranda* warnings because it was not designed or reasonably likely to elicit an incriminating response from Guerrero-Sanchez, but rather was a casual conversation. *See State v. Tucker*, 81 Ohio St.3d 431, 436-438, 692 N.E.2d 171 (1998).

{¶ 41} Since Guerrero-Sanchez was not in custody when he discussed the drugs with the officers, his statements are not suppressible under *Miranda*. Accordingly, Guerrero-Sanchez's argument that his statements should be suppressed as a result of not being *Mirandized* is overruled.

### *Guerrero-Sanchez Voluntarily Consented to the Search*

{¶ 42} For his third claim, Guerrero-Sanchez contends that the drug evidence found in his hotel room should have been suppressed because he did not voluntarily consent to the warrantless search of his hotel room.

{¶ 43} Searches conducted without a warrant are per se unreasonable, subject to only a few specifically established and well recognized exceptions. *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One such exception is a search conducted pursuant to voluntary consent. *Id.* In order to rely upon the consent exception to the Fourth Amendment's warrant requirement, the State must prove by " 'clear and positive evidence' that the consent was 'freely and voluntarily given' " and not " 'the product of duress or coercion, express or implied.' " *Posey* at 427, quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). (Other citation

omitted.)

{¶ 44} " '[W]hether a consent to search was in fact "voluntary" or was the product of duress or coercion, express or implied, is a question of fact to be determined under the totality of the circumstances.' " *Id.*, quoting *Schneckloth at 227*. "The following factors are generally used in Ohio to decide if a defendant's consent to search has been given voluntarily: '(1) whether the defendant's custodial status was voluntary; (2) whether coercive police procedures were used; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; [and] (6) the defendant's belief that no incriminating evidence will be found.' " *State v. Mabry*, 2d Dist. Montgomery No. 26242, 2015-Ohio-4513, ¶ 15, quoting *State v. Black*, 2d Dist. Montgomery No. 23524, 2010-Ohio-2916, ¶ 36-41. We note that the State's burden to prove voluntary consent is heavier when it appears the defendant does not readily speak and understand the English language. *State v. Rodriguez*, 8th Dist. Cuyahoga No. 98422, 2013-Ohio-491, ¶ 21, citing *United States v. Hernandez*, 443 Fed.Appx. 34, 40 (6th Cir.2011).

{¶ 45} Guerrero-Sanchez contends that he did not voluntarily consent to the search of his hotel room because he did not speak or understand English and therefore did not understand what Agent Swallen and Detective Walters were saying during the encounter. He also claims that Swallen and Walters used coercive police procedures during the encounter such as pushing him into the hotel room when he answered the door, sitting him on the couch, and handcuffing him prior to the search. Guerrero-Sanchez further claims that he was not cooperative during the encounter and that he was unaware of his right to refuse consent.

{¶ 46} In overruling Guerrero-Sanchez's motion to suppress the drug evidence found in his hotel room, the trial court relied on the testimony of Agent Swallen, Detective Walters, and Officer Lockhart. As previously discussed, the officers' testimony provides competent and credible evidence supporting the fact that Guerrero-Sanchez spoke English and understood what the officers were saying. Guerrero-Sanchez's intelligence and education are not otherwise at issue, as Guerrero-Sanchez is an employable 36-year-old who completed 11 years of schooling.

{¶ 47} Swallen and Walters' testimony also establishes that no coercive measures were used to obtain Guerrero-Sanchez's consent and that Guerrero-Sanchez was cooperative throughout the encounter. Unlike Guerrero-Sanchez's version of events, Swallen testified that he knocked on the hotel-room door and requested to speak with Guerrero-Sanchez, who opened the door and motioned for Swallen to come inside. Instead of pushing Guerrero-Sanchez in the room, forcing him to sit on the couch, and handcuffing him, Swallen testified that when he walked in the room Guerrero-Sanchez put on a pair of jeans, sat on the couch, and voluntarily responded to Swallen's questions before consenting to a search of the hotel room. The officers also testified that they did not have their weapons drawn or showing and that Guerrero-Sanchez was not handcuffed prior to giving his consent to search. As a further matter, there is no indication that the officers used any threats of force or false claims to obtain Guerrero-Sanchez's consent.

{¶ 48} The fact that Guerrero-Sanchez was allegedly unaware of his right to refuse the officers' request to talk and search the hotel room does not by itself render the consent involuntary. "An individual's knowledge of the right to refuse consent 'is not a prerequisite of a voluntary consent.' " *Mabry*, 2d Dist. Montgomery No. 26242, 2015-

Ohio-4513 at ¶ 16, quoting *Schneckloth*, 412 U.S. at 234, 93 S.Ct. 2041, 36 L.Ed.2d 854. "In fact, '[t]he [United States Supreme] Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.' " *Id.*, quoting *United States v. Drayton*, 536 U.S. 194, 206, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). "In other words, 'while the knowledge of the right to refuse consent is one factor to be considered, it is not the sine qua non of a voluntary consent.' " *Id.*, quoting *State v. Watts*, 2d Dist. Montgomery No. 21982, 2007-Ohio-2411, ¶ 17, citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

{¶ 49} In light of the factors to be taken into consideration and the officers' testimony, we find that the totality of the circumstances indicate that Guerrero-Sanchez voluntarily consented to the search at issue. Because the trial court found the officers' testimony credible, and said testimony supports a finding of voluntary consent, the trial court did not err in overruling Guerrero-Sanchez's motion to suppress the drug evidence seized from the hotel room. Accordingly, Guerrero-Sanchez's argument that the evidence found in his hotel room should have been suppressed is overruled.

{¶ 50} Guerrero-Sanchez's First Assignment of Error is overruled.


**Second Assignment of Error**

{¶ 51} Guerrero-Sanchez's Second Assignment of Error is as follows:

THE TRIAL COURT ERRED WHEN IT SENTENCED GUERRERO-SANCHEZ TO ELEVEN YEARS IN PRISON ON COUNT I [aggravated possession of drugs, to wit: fentanyl].

{¶ 52} Under his Second Assignment of Error, Guerrero-Sanchez contends that the trial court erred in sentencing him to the maximum 11-year prison term for the count of aggravated possession of drugs that stemmed from his possession of 1,063 grams of fentanyl. Specifically, Guerrero-Sanchez claims the trial court's finding that his conduct was the worst form of the offense is not supported by the record because said finding was based solely on the type and quantity of drug he possessed. Guerrero-Sanchez claims this was improper because the type and quantity of drug are already accounted for as part of the possession offense under R.C. 2925.11(A) and (C)(1)(d). Since the type and quantity of drug are already accounted for, and since this is his first felony conviction to which none of the more serious factors in R.C. 2929.12(B) apply, Guerrero-Sanchez claims there is nothing in the record supporting the maximum sentence imposed by the trial court.

{¶ 53} The Supreme Court of Ohio has made clear that felony sentences are to be reviewed in accordance with the standard set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 10, 16. *Accord State v. Rodeffer*, 2013-Ohio-5759, 5 N.E.3d 1069 (2d Dist.). Pursuant to the plain language of R.C. 2953.08(G)(2), "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Marcum* at ¶ 1.

{¶ 54} The Supreme Court further explained that:

[S]ome sentences do not require the findings that R.C. 2953.08(G) specifically addresses. Nevertheless, it is fully consistent for appellate

courts to review those sentences that are imposed solely after consideration of the factors in R.C. 2929.11 and 2929.12 under a standard that is equally deferential to the sentencing court. That is, an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence.

*Id.* at ¶ 23.

**{¶ 55}** This is a very deferential standard of review, as the question is not whether the trial court had clear and convincing evidence to support its findings, but rather, whether we clearly and convincingly find that the record fails to support the trial court's findings. *Rodeffer* at ¶ 31, citing *State v. Venes*, 2013-Ohio-1891, 992 N.E.2d 453, ¶ 21 (8th Dist.). Under this standard of review " 'appellate courts are prohibited from substituting their judgment for that of the trial judge.' " (Emphasis omitted.) *State v. Withrow*, 2016-Ohio-2884, 64 N.E.3d 553, ¶ 37 (2d Dist.), quoting *State v. Overholser*, 2d Dist. Clark No. 2014-CA-42, 2015-Ohio-1980, ¶ 38 (Welbaum, J., dissenting). "As a result, we must affirm the decision of the trial court even though we might be persuaded that the trial court's decision in this regard 'constitutes an absence of the exercise of discretion[.]' " *Id.*, quoting *State v. Adams*, 2d Dist. Clark No. 2014-CA-13, 2015-Ohio-1160, ¶ 35 (Hall, J., dissenting).

**{¶ 56}** In this case, the trial court was not required to make any findings under the specific statutes addressed in R.C. 2953.08(G)(2). Furthermore, Guerrero Sanchez's prison sentence is not clearly and convincingly contrary to law, as the sentence was within the authorized statutory range, *see* R.C. 2929.14(A)(1), and the trial court expressly

stated at the sentencing hearing that it had considered "the purposes and principles of sentencing in the Revised Code, [and] the seriousness and recidivism factors contained therein * * *." Trans. (Nov. 1, 2016), p. 108. *See State v. Walden, 2d Dist.* Clark No. 2014-CA-84, 2016-Ohio-47, ¶ 7, quoting *State v. Martin*, 2d Dist. Clark No. 2014-CA-69, 2015-Ohio-697, ¶ 8 (" 'a maximum sentence is not contrary to law when it is within the statutory range and the trial court considered the statutory purposes and principles of sentencing as well as the statutory seriousness and recidivism factors' ").

{¶ 57} Because the trial court was not required to make any of the findings addressed in R.C. 2953.08(G)(2) and the 11-year prison sentence is not clearly and convincingly contrary to law, the threshold issue in this case is whether there is clear and convincing evidence that the record does not support the maximum sentence imposed by the trial court. Again, "an appellate court may vacate or modify any sentence that is not clearly and convincingly contrary to law only if the appellate court finds by clear and convincing evidence that the record does not support the sentence." *Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231 at ¶ 23.

{¶ 58} In sentencing Guerrero Sanchez to the maximum prison term, the trial court considered the factors under R.C. 2929.12 to determine whether the conduct constituting his offense was more or less serious. Although none of the enumerated "more serious" factors applied in this case, the statute nevertheless instructs the trial court to also consider "any other relevant factors, as indicating that the offender's conduct is more serious than conduct normally constituting the offense[.]" R.C. 2929.12(B). Here, the court considered the fact that this is Guerrero Sanchez's first felony conviction, but also "considered that the drug amount, the type of drug * * * in this case, was fentanyl, a drug

being trafficked which is the cause of many many deaths in this county, overdose deaths." Trans. (Nov. 1, 2016), p. 108. The record indicates that Guerrero had 1,063 grams of fentanyl in his possession, which is greater than 50 times the bulk amount but less than 100 times the bulk amount. Based on these considerations, the trial court found that Guerrero's aggravated possession of drugs offense was the worst form of the offense, warranting the maximum prison term.

{¶ 59} As previously noted, Guerrero Sanchez claims the record does not support the maximum sentence because he has no prior felony convictions and the type and quantity of drug he possessed are already accounted for in the offense itself. In other words, Guerrero-Sanchez maintains that the type and quantity of drug are not proper factors to consider when determining whether his offense is more serious under the R.C. 2929.12 analysis.

{¶ 60} A similar argument was raised by the appellant in *State v. Sieng*, 10th Dist. Franklin No. 06AP-852, 2007-Ohio-1502. In *Sieng*, the defendant claimed the trial court improperly considered the large quantity of cocaine in his possession and the potential harm to the community as factors making his drug trafficking offense more serious than conduct normally constituting the offense under the R.C. 2929.12 analysis. *Id.* at ¶ 12-16. In response, the Tenth Appellate District noted that appellant cited "no authority for the proposition that a trial court is precluded from considering the quantity of a drug in its analysis of the seriousness of the offender's conduct" and ultimately found the argument unpersuasive. *Id.* at ¶ 13 and 15. The *Sieng* court held that the quantity of the drug and the potential harm to the community were relevant as part of the trial court's consideration of "other relevant factors" that made the offense more serious pursuant to

R.C. 2929.12(B). *Id.* at 15-16.

{¶ 61} In reaching this conclusion, the *Sieng* court relied on this court's decision in *State v. Barger*, 2d Dist. Champaign No. 2006-CA-12, 2006-Ohio-5559. In *Barger*, the trial court sentenced the defendant to more than the minimum sentence for trafficking between 1,000 and 5,000 grams of marijuana. *Id.* at ¶ 1. The trial court explained that the amount of drugs sold made the defendant's offense more serious, noting that it was "the largest marijuana sale known to Champaign County." *Id.* at ¶ 16. On appeal, the defendant in *Barger* challenged his sentence under R.C. 2929.12 arguing that the amount of the controlled substance had already been accounted for by it being classified by the legislature as a third degree felony. *Id.* at ¶ 17. We, however, held that the trial court had properly considered the relevant statutory sentencing factors, including the fact that "the amount of the controlled substance involved was substantial." *Id.* at ¶ 26.

{¶ 62} In addition to *Barger*, the *Sieng* court relied on the Fourth District Court of Appeals' decision in *State v. Sideris*, 4th Dist. Athens No. 04CA37, 2005-Ohio-1055. In *Sideris* the court held that, although not an enumerated factor under R.C. 2929.12(B), the trial court could properly consider the fact the defendant had a large quantity of drugs in his possession as part of its consideration of "other relevant factors" demonstrating the seriousness of the defendant's offenses. *Sideris* at ¶ 27.

{¶ 63} Other Ohio courts have similarly affirmed sentences in which the trial court, in considering the R.C. 2929.12 factors, discussed the drug quantity at the sentencing hearing. *See, e.g., State v. Hull,* 2017-Ohio-157, 77 N.E.3d 484, ¶ 42 (11th Dist.) ("The trial court's finding that the amount of drugs in Hull's possession was unusually large for a Lake County drug-related offense is well within the court's bailiwick and is relevant as

'any other factor * * * indicating the offender's conduct is more serious than conduct normally constituting the offense[.]' "); *State v. Carter*, 11th Dist. Portage No. 2003-P-0007, 2004-Ohio-1181, ¶ 47; *State v. Kail*, 3d Dist. Wyandot No. 16-03-06, 2003-Ohio-6312, ¶ 11; *State v. McGinnis*, 9th Dist. Medina No. 05CA0061-M, 2006-Ohio-2281, ¶ 51-52.

**{¶ 64}** Based on the foregoing authority, we do not find that it was inappropriate for the trial court to consider the amount of fentanyl when sentencing Guerrero-Sanchez to a maximum sentence. Under the circumstances of this case, we also do not find that it was inappropriate for the trial court to find that Guerrero-Sanchez's offense was more serious as a result of him possessing fentanyl. We note that Guerrero Sanchez was convicted of possessing "a compound, mixture, preparation, or substance included in schedule I or II." R.C. 2925.11(C)(1). Fentanyl is one of many schedule II drugs listed under R.C. 3719.41(B)(9). As noted by the trial court, fentanyl has caused an epidemic of overdose deaths in Montgomery County. Because of this, the trial court essentially determined that fentanyl stands apart from the other schedule I and II drugs, and is a more serious form of the offense due to its negative impact on Montgomery County. The impact on the community is a proper factor to consider during sentencing. *State v. Sanders*, 8th Dist. Cuyahoga No. 97120, 2012-Ohio-1540, ¶ 38 (finding the trial court's discussion about the harm to the community is not an improper factor to consider when imposing a maximum sentence). *Accord Sieng*, 10th Dist. Franklin No. 06AP-852, 2007-Ohio-1502 at ¶ 17.

**{¶ 65}** Although the prison sentence imposed by the trial court is debatable given that this was Guerrero-Sanchez's first felony conviction, we nevertheless cannot say that

we find by clear and convincing evidence that the record does not support the trial court's decision to impose the maximum prison term. The record indicates that Guerrero-Sanchez had a large amount of fentanyl in his possession, 1,063 grams, and that the fentanyl was banded together with $2,330. The record also indicates that vacuum sealed bags and a box for a digital scale were discovered in Guerrero-Sanchez's hotel room. From these facts, the trial court could have reasonably concluded that the fentanyl was being prepared for sale to others and would have contributed to the epidemic of overdose deaths in Montgomery County. Simply stated, the issue is not whether this court disagrees with the trial court's finding that possessing the large amount of fentanyl at issue constitutes the worst form of the offense, as we may not substitute our judgment for that of the trial court's. Rather, we must determine if the trial court's more serious findings are unsupported by the record, and they are not. Accordingly, we must defer to the trial court's sentencing decision.

{¶ 66} Guerrero-Sanchez's Second Assignment of Error is overruled.

## Conclusion

{¶ 67} Having overruled both assignments of error raised by Guerrero-Sanchez, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Andrew T. French
Robert Alan Brenner
Hon. Gregory F. Singer